In re The **MASON & DIXON LINES INCORPORATED**, Debtor.

**Bankruptcy No. B–84–00377C–11.**

United States Bankruptcy Court, M.D. North Carolina.

March 25, 1986.

Order Confirming Restated Joint Plan of Reorganization March 29, 1986.

John Young, Fitzgerald, Young, Peters, Dakmak & Bruno, Detroit, Mich., William L. Stocks, Nichols, Caffrey, Hill, Evans & Murrelle, Greensboro, N.C., for debtor.

George E. Gilbertson, Burlington, N.C., Trustee.

·R. Bradford Leggett, Catharine R. Carruthers, Allman, Spry, Humphreys & Armentrout, Winston-Salem, N.C., for trustee.

Michael A. Nedelman, Patrick A. Moran, Simpson & Moran, Birmingham, Mich., for Central Transport, Inc.

Herbert S. Falk, Jr., Greensboro, N.C., Elizabeth Roberto, Law Offices of Russell N. Luplow, Bloomfield Hills, Mich., for Central States Southeast, Southwest Areas Pension Fund.

Jonathan Harkavy, Greensboro, N.C., Dennis R. Wilcox, Climaco, Seminatore, Lefkowitz & Kaplan, Cleveland, Ohio, for Teamsters.

Thomas W. Waldrep, Jr., James C. Frenzel, Womble, Carlyle, Sandridge & Rice, Winston-Salem, N.C., for CORE.

Rayford K. Adams III, Tuggle, Duggins, Meschan & Elrod, Greensboro, N.C., for FNBB.

Sally A. Conti, Richard M. Hutson II, Mount, White, Hutson & Carden, Durham, N.C., for Unsecured Creditors Committee.

## MEMORANDUM OPINION RE: RESTATED JOINT PLAN OF REORGANIZATION

RUFUS W. REYNOLDS, Chief Judge.

On January 23, 1986, George E. Gilbertson, Trustee for The Mason & Dixon Lines Incorporated ("Mason/Dixon") and Central Transport, Inc. ("Central Transport") filed their Restated Joint. Plan of Reorganization for Mason/Dixon, which was amended on February 5, 1986, (as amended, the "Restated Joint Plan"). The Restated Joint Plan was thereafter transmitted to creditors, and objections to confirmation of the Restated Joint Plan were filed by Central States, Southeast and Southwest Areas Pension Fund (the "Central States Fund"), First National Bank of Boston ("FNBB"), Committee of Retired Employees ("CORE"), and Teamsters Joint Counsel No. 83 Pension Fund (the "Virginia Fund"). After due notice, the initial hearing on confirmation of the Restated Joint Plan was held on March 18, 1986 at which were present, among others, the proponents of

the Restated Joint Plan with counsel, and Mason/Dixon, Central States Fund, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, CORE, the Official Unsecured Creditors' Committee (the "Creditors' Committee"), and FNBB, all through counsel. The Court, having carefully considered the arguments and briefs of counsel, the testimony of witnesses, and the official court file, does herewith make its findings of facts and conclusions of law.

## I.

## BACKGROUND AND PROCEDURAL HISTORY OF THE RESTATED JOINT PLAN

### A. *Summary of Restated Joint Plan and Disclosure Statement*

This case was commenced by the filing of a voluntary Chapter 11 petition on March 29, 1984. On December 6, 1984, George E. Gilbertson was appointed as Trustee pursuant to the provisions of 11 U.S.C. § 1104. On September 6, 1985 the Trustee and Central Transport filed a Joint Plan of Reorganization and Disclosure Statement. Although this particular Plan was not approved, on November 12, 1985, the Joint Disclosure Statement as amended was approved by the Court.

On January 23, 1986 the Restated Joint Plan was filed by the Trustee and Central Transport. It was amended on February 5, 1986 and was transmitted to creditors and parties in interest for voting.

The Restated Joint Plan before the Court provides generally for the payment in full, on the effective date, of allowed cost of administration claims, priority claims, [excluding the claims of taxing authorities which are paid in accordance with 11 U.S.C. § 1129(a)(9)(C)], and the undisputed portion of the secured claim of the FNBB. Unsecured creditors will receive preferred stock in full satisfaction of their claims.

Based on the Mason/Dixon's performance during this Chapter 11 proceeding and the liquidation analysis attached to the disclosure statement, it is doubtful that the liquidation of the Mason/Dixon would generate sufficient funds to cover cost of administration claims, much less provide any payment for priority or unsecured claims.

### B. *Modifications.*

At the March 18, 1986 hearing, certain modifications to the Restated Joint Plan were proposed and agreed to by the proponents of the Restated Joint Plan and Mason/Dixon.

At the request of the proponents of the Restated Joint Plan, the Restated Joint Plan shall be deemed modified as follows:

1. Article IX, *Retention of Jurisdiction,* paragraph 3 shall have the following subheading I. added thereto:

I. Hear any disputes involving funding of the plan under the Post Confirmation Line of Credit including, but not limited to, failure by GLS LeasCo, Inc. to fund up to the maximum of $12,000,000 under such line of credit, default by Mason/Dixon thereunder, or in any modification thereof and to give notice to the Teamsters National Freight Industry Negotiating Committee upon the happening of any such events.

To the extent the (1) failure to extend the maximum line of credit, (2) default or (3) modification in such line of credit will negatively effect the payment of any allowed administrative or wage priority claims, GLS LeasCo, Inc. shall give ten (10) days notice, if possible, or as much notice as is possible under the circumstances, to the Teamsters National Freight Negotiating Committee, of (1) the failure to extend the maximum line of credit, (2) declaration of default or (3) modification in such line of credit, if such events will negatively effect the payment of any allowed administrative or wage priority claims.

2. Article VI, *Execution Of The Plan,* paragraph 5, shall have the following sentence added:

The Post Confirmation Line of Credit shall further be subject to the condi-

tions in Article IX, *Retention of Jurisdiction,* paragraph 3 I herein.

3. Article VI, *Execution Of The Plan,* paragraph 13 shall be deleted. All parties are left with those rights and defenses which may exist at law and equity without regard to the deletion of Article VI, Paragraph 13.

After review of the modifications, this Court finds that the modifications are not material and do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted the modification in writing. The Restated Joint Plan as modified above will therefore be deemed accepted by all creditors and equity security holders who have previously accepted the Restated Joint Plan and have not subsequently rejected the Restated Joint Plan in writing.

### C. *Voting On The Plan By Impaired Creditor Classes*

The Trustee has reported and the record reflects that the Restated Joint Plan has been accepted or rejected in writing by the following impaired classes of creditors:

Class 2 (First National Bank of Boston): Rejected by the sole vote cast, representing 100% of the dollar amount of the claims voting.

Class 3 (Transport Insurance Company): Accepted by 100% of the votes cast, representing 100% of the dollar amount of the claims voting.

Class 6 (General Unsecured Creditors): Accepted by 1498 (87%) of the votes cast, representing $11,174,609 (93%) of the dollar amount of the claims voting.

Class 7 (Pension Fund Withdrawal Claims): Rejected by each of the votes cast, representing 100% of the dollar amount of the claims voting.

At the initial confirmation hearing on the Restated Joint Plan, FNBB stated that it favored the plan and that it desired to accept the same.

### D. *Objections.*

The objections filed by CORE were withdrawn at the March 18, 1986 hearing. In addition, FNBB represented that the concerns it had had were satisfied by the proponents of the Restated Joint Plan prior to the hearing, and FNBB thereby withdrew its opposition to confirmation.

Objections were also filed on behalf of the Virginia Fund. Although counsel for the Virginia Fund did not appear at the March 18, 1986 hearing, the Court has given due consideration to their objections. Those objections are overruled for the reasons set forth below.

The Central States Fund also raised objections to confirmation. The Central States Fund has objected, *inter alia,* to the classification scheme proposed in the Restated Joint Plan which places all allowed withdrawal claims within Class 7; has asserted that the Central States Fund would receive more through liquidation of the Debtor than under the Restated Joint Plan; and has asserted that the Restated Joint Plan is not feasible.

### II.

### CLASSIFICATION OF CLAIMS

In the Restated Joint Plan, the Trustee and Central Transport have separated the prepetition unsecured claims into Classes 6 and 7. Class 6 claims are:

All allowed general Unsecured Claims, including Rejection Claims and claims of secured creditors to the extent the same are unsecured, but excluding Withdrawal Claims.

Class 7 claims are all allowed Withdrawal Claims:

Any claim for complete withdrawal or partial withdrawal from multiemployer pension plans pursuant to 29 U.S.C. § 1381 *et seq,* other than an Administrative Claim. [Restated Joint Plan Art. I, ¶ 28.]

Included within Class 7 is the claim of Central States Fund[1]. On or about April

---

1. Also included in Class 7 are the Withdrawal

Claims (to the extent allowed) of the Teamsters

14, 1984 the Central States Fund originally filed a contingent proof of claim for $26,-357,365.86 based upon the Central States Fund's belief that Mason/Dixon would suffer a complete withdrawal under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") 29 U.S.C. § 1301 *et seq.* which amended the Employee Retirement Income Security Act of 1974 ("ERISA") 29 U.S.C. § 1001 *et seq.* On March 18, 1985, the Central States Fund filed on contingent amended proof of claim in the amount of $7,311,109.83 and a fixed amended claim for $19,909,711.72. On September 13, 1985 the Central States Fund filed its first amended proof of claim for $26,295,533.25. (The proofs of claim filed by the Central States Fund are hereafter referred to as the "Central States Fund's Claim.") The Central States Fund's Claim is based upon the alleged cessation of an obligation to contribute to the Central States Fund arising from the decertification and resulting expiration of a collective bargaining agreement in December, 1983 for a five man local unit who were employees of the Mason/Dixon's subsidiary, The Mason & Dixon Tank Lines, Inc. ("Tank Lines"). The *amount* of the Central States Fund's claim, however, is not based upon the loss to the Central States Fund of Tank Lines' contributions for the five men (only $55.00 per week per person), but rather on Mason/Dixon's post-petition (1984) job force reduction.

On July 1, 1985, the Trustee filed his objections to the Central States Fund's Claim. Subsequently Central Transport filed its objections to the claim. On March 5, 1986, the United States District Court for the Eastern District of Tennessee, Northeastern Division granted Central Transport's motion for summary judgment holding in part that Central Transport is not liable for the Tank Lines' decertification and that the withdrawal liability of $26,295,533.25 asserted as a result of the Tank Line decertification was improperly

calculated. *Central Transport, Inc., Et Al v. Central States Southeast and Southwest Area Pension Fund, Et Al;* 640 F.Supp. 56 (E.D.Tenn.)

### A. The Bankruptcy Code Allows Several Classes Of Unsecured Claims.

■ A plan proponent has flexibility in classifying general unsecured claims. Section 1123(a)(1), 11 U.S.C. § 1123(a)(1), requires that a plan of reorganization:

designate, subject to Section 1122 of this title, classes of claims, other than claims of a kind specified in Section 507(a)(1), 507(a)(2), or 507(a)(6) of this title, and classes of interests.

In turn, 11 U.S.C. § 1122 provides:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

Section 1123 of the Bankruptcy Code, 11 U.S.C. § 1123, does not set forth a fixed classification scheme; rather, it allows a plan proponent to classify rationally general unsecured claims, subject only to the requirement of Section 1122(a) that all claims placed within the same class be substantially similar. In this regard, Sections 1122 and 1123 represent a departure from the requirements of repealed Section 197 of the Bankruptcy Act, which provided that:

The judge shall fix the division of creditors and stockholders into classes according to the nature of their respective claims and stock.

11 U.S.C. § 597 (repealed). Section 597 was interpreted to *require* that all claims

Joint council No. 83 of Virginia Pension Fund, Teamsters Health and Welfare Pension trust funds of Philadelphia and Vicinity, Chicago Truck Drivers, Helpers and Warehouse Workers

Union (Independent) Pension Fund, Freight Drivers and Helpers Local Union No. 557 Pension Fund and the Central Pennsylvania Teamsters Pension Fund.

of a similar nature be classified together. *See e.g., In re Los Angeles Land and Investments, Ltd.,* 282 F.Supp. 448 (D.Hawaii 1968). In enacting the Bankruptcy Code, Congress could have, but did not, perpetuate that requirement.

■ Section 1122 does not require one single class of substantially similar claims. In *In re Huckabee Auto Co.,* 33 B.R. 132 (Bankr.M.D.Ga.1981), the court *rejected* the assertion that a plan which failed to group together substantially similar claims or interests violated 11 U.S.C. § 1122(a). The *Huckabee* court noted that although the repealed Bankruptcy Act required that substantially similar claims be classed together, the Bankruptcy Code did *not* contain a similar requirement. *Id.* at 137. *See 5 Collier on Bankruptcy,* 1122–7 [¶ 1122.-03] (15th Ed.).

Similarly, in *Barnes v. Whelan,* 689 F.2d 193 (D.C.Cir.1982), the Circuit Court held that the lower court had erred in prohibiting the separate classification of unsecured claims pursuant to § 1122(a).[2] The Court stated:

> Section 1122(a) specifies that only claims which are "substantially" similar may be placed in the same class. It does not require that similar claims *must* be grouped together, but merely that any group created must be homogeneous. Although some courts have held that Section 1122(a) prohibits classification based on any criteria other than the legal right to the debtor's assets, the plain language of the statute contradicts such a construction. (Citations omitted.) 689 F.2d at 201

*See also In re Moore,* 31 B.R. 12, 16 (Bankr.S.C.1983).

Notwithstanding the clear language of 11 U.S.C. § 1122 and the wide latitude it affords a plan proponent, the Court is aware that some courts have held that all unsecured claims must be classed together. Notwithstanding these determinations, the

Court finds and concludes that the classification scheme in the Restated Joint Plan is proper.

A critical review of those cases which have held that all unsecured claims must be placed into a single class indicates that those courts have attempted to create a statutory requirement where none exists, and have relied upon pre-Code case law and statutory requirements, rather than the standards set forth in the Bankruptcy Reform Act of 1978. Those courts that have rejected separate classification of unsecured claims have generally done so because the purpose of the classification schemes was to gerrymander the creditors' vote. *In re Mastercraft Record Plating, Inc.,* 32 B.R. 106 (Bankr.S.D.N.Y.1983); *In re Pine Lake Village Apartment Co.,* 19 B.R. 819 (Bankr.S.D.N.Y.1982). *Cf. Granada Wines v. New England Teamsters Pension Fund,* 748 F.2d 42, 46 (1st Cir. 1984) (dictum).

The Central States Fund has indicated that the Fund relies on the *Granada Wines* decision to oppose the separate class for Withdrawal Claims. However, the *Granada Wines* court's discussion of the *Code's* allowed classification schemes relies upon Bankruptcy *Act* cases. That court neither discussed nor recognized the repeal of former 11 U.S.C. § 597 nor the enactment of 11 U.S.C. §§ 1122 and 1123. As a result, *Granada Wines* is not controlling and does not preclude the classification scheme set forth by the Trustee and Central Transport in the Restated Joint Plan.

B. *The Withdrawal Claims Are Not Substantially Similar To Those Claims In Class 6.*

■ The Central States Fund's Claim and the other Withdrawal Claims are not substantially similar to the Class 6 claims. It is therefore permissible to place these claims in a separate class. The Central States Fund's Claim, as well as the other

---

2. While this decision involved a Chapter 13 proceeding, the holding is applicable to this case since 11 U.S.C. § 1122 is referenced in 11 U.S.C. § 1322(b)(1). *See In re Planes, Inc.,* 48 B.R. 698, 700 (Bankr.N.D.Ga.1985) (stating "these decisions are relevant in their pragmatic reading of § 1122").

claims for alleged withdrawal liability, which, if allowed, will be included in Class 7, are not substantially similar to the Class 6 claims of general unsecured creditors.

11 U.S.C. § 1122(a) allows a plan proponent to classify dissimilar claims in separate classes. One court has ruled that such classification is mandatory. In *In re U.S. Truck Co., Inc.*, 42 B.R. 790, 794 (Bankr.E.D.Mich.1984), the bankruptcy court denied confirmation based upon the inclusion of workers compensation claims in the class of general unsecured creditors. That court held that the statutory nature of the workers compensation claims rendered them sufficiently dissimilar from general unsecured claims so that their joint classification did not comply with 11 U.S.C. § 1122(a).

Pension fund withdrawal liability claims are different from general unsecured claims in several major respects:

(1) Withdrawal claims do not represent an amount actually owed to the pension funds had the collective bargaining agreement remained in force. Withdrawal claims are statutorily created hypothetical debts; the amount alleged due is not based upon a consideration or value received by the debtor or its employees. The amount is based upon (a) what the creditor estimates it needs to pay future benefits for all of its beneficiaries (including employees and retirees from companies competing with the debtor), (b) investment practices of the individual pension funds, (c) business failures of other employers who contribute to the pension funds, (d) the number of active employees who participate in each pension fund, and (e) the unilaterally adopted actuarial assumptions of each pension fund;

(2) It is possible that the trustees of the pension funds may not use any of the proceeds from payment of a withdrawal liability claim to pay benefits to retired workers of the debtor for many years, if at all; the proceeds from payment of a withdrawal claim are commingled with other funds and do not result in a direct economic benefit either to the debtor's employees or to the debtor;

(3) Payments of a withdrawal claims are made over a period of time designated by statute and modified by the trustees of the pension funds having withdrawal claims;

(4) If Mason/Dixon does not pay the withdrawal claims and the equity security holder does not pay the withdrawal claims, the claims are then owed to each pension fund by all of the remaining employers who participate in each pension fund even though they have no affiliation with Mason/Dixon; and

(5) Central States Pension Fund has asserted that the equity security holder of Mason/Dixon is jointly and severally liable for payment of the withdrawal claim and that the amount of the claim is determined as if Mason/Dixon had also withdrawn from the pension fund.

In sum, the classification scheme in the Restated Joint Plan complies with the requirements of 11 U.S.C. § 1123 and § 1122, and consequently 11 U.S.C. § 1129(a)(1). The objections of the Central States Fund and Virginia Fund are overruled.

### III.

### THE RESTATED JOINT PLAN COMPLIES WITH 11 U.S.C. § 1129(a) WITH THE EXCEPTION OF 11 U.S.C. § 1129(a)(8)

After a review of the Restated Joint Plan, and consideration of the objections raised by the Central States Fund and the Virginia Fund, the Court finds and concludes as follows:

1. The Restated Joint Plan complies with the applicable provisions of Chapter 11 of the Bankruptcy Code, as required by 11 U.S.C. § 1129(a)(1).

2. The proponents of the Restated Joint Plan have complied with the applicable provisions of Chapter 11 of the Bankruptcy Code, as required by 11 U.S.C. § 1129(a)(2).

3. The Restated Joint Plan has been proposed in good faith and not by any means forbidden by law, as required by 11 U.S.C. § 1129(a)(3).

4. All payments made or promised to be made by the proponents of the Restated Joint Plan for services or for costs and expenses in connection with the Restated Joint Plan and incident to the case have been fully disclosed to the Court and are reasonable, or if to be fixed after confirmation of the Restated Joint Plan, will be subject to the approval of the Court. The Restated Joint Plan therefore complies with 11 U.S.C. § 1129(a)(4).

5. The identity, qualifications, and affiliations of the persons who are or may be directors or officers or trustees, if any, of Mason/Dixon after confirmation of the Restated Joint Plan have been fully disclosed and the appointment of such persons to such offices or their continuance in those offices is equitable and consistent with the interests of the creditors and with public policy; and the identity of any insider that will be employed or retained by Mason/Dixon and his compensation has been fully disclosed. The Restated Joint Plan therefore complies with 11 U.S.C. § 1129(a)(5).

6. The Restated Joint Plan does not provide for any changes in rates over which any regulatory commission will have jurisdiction. Therefore 11 U.S.C. § 1129(a)(6) does not apply to this case.

7. With respect to each class, each holder of a claim or interest of such class has either accepted the Restated Joint Plan or will receive or will retain under the Restated Joint Plan on account of such claim or interest property of a value, as of the Effective Date of the Restated Joint Plan, that is not less than the amount that such holder would receive or retain were Mason/Dixon liquidated under Chapter 7 of the Bankruptcy Code on such date. The record in this case clearly evidences that the holders of Class 7 claims would receive nothing on liquidation of Mason/Dixon under Chapter 7 on the Effective Date. The Central States Fund has not introduced any evidence to the contrary, and its objections in this regard are overruled. The Restated Joint Plan complies with 11 U.S.C. § 1129(a)(7).

8. The Restated Joint Plan complies with 11 U.S.C. § 1129(a)(9) in the following manner:

A. Except to the extent that the Restated Joint Plan provides that current trade obligations shall be paid in the ordinary course of business and that certain consenting creditors shall be paid in convertible debentures, the Restated Joint Plan provides that with respect to the § 507(a)(1) expense of administration claims, including the Trustee's compensation, the claims of the attorneys and accountants for Mason/Dixon, the Trustee, CORE, the Creditors' Committee, and the Examiner, and the fees and expenses of the Examiner and of M.C. Benton as consultant, allowed as of Confirmation, shall be paid in full, in cash, on the Effective Date or such later date as such claims shall have been finally allowed.

B. Claims having priority under §§ 507(a)(3) and 507(a)(4) of the Bankruptcy Code [included within Class 1B as defined in the Restated Joint Plan] shall be paid in full, in cash, on the Effective Date or such later date as such claims shall have been finally allowed.

C. Claims in Class 1C, which have priority under § 507(a)(6) [prior to amendment by the Bankruptcy Amendments and Federal Judgeship Act of 1984] of the Bankruptcy Code will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value as of the Effective Date equal to the allowed amount of such claim with interest as provided in the Restated Joint Plan.

10. Classes 3 and 6 are impaired under the Restated Joint Plan, and each have accepted the Restated Joint Plan, which acceptance was determined without including the acceptance of the plan by any insider holding a claim of such class. The Re-

stated Joint Plan complies with 11 U.S.C. § 1129(a)(10).

11. The proponents of the Restated Joint Plan have asserted and the record shows that Mason/Dixon must obtain credit in order to effectuate the Restated Joint Plan, and additionally that Mason/Dixon is unable to obtain unsecured credit, but can obtain the necessary credit only by granting a security interest in all its assets. It is necessary for Mason/Dixon to effectuate the Restated Joint Plan and it is in the best interests of the estate and its creditors that Mason/Dixon enter into a certain loan agreement with GLS LeasCo, Inc. (the "GLS Loan Agreement"), substantially in the form previously made available to any party-in-interest upon written request, whereby GLS LeasCo, Inc. will make available to Mason/Dixon a secured line of credit in an amount not exceeding $12,000,000.00, subject to the terms and conditions set forth in the GLS Loan Agreement.

12. At the hearing on March 18, 1986 the Central States Fund requested and was granted an opportunity to present evidence concerning the feasibility of the Restated Joint Plan. The Central States Fund presented four witnesses, including counsel for the Trustee and FNBB. After carefully considering the record in this case, and the testimony elicited, this Court concludes that the Restated Joint Plan is feasible and that the terms and conditions of the proposed loan agreement with GLS LeasCo, Inc. are not inconsistent with those which could reasonably be expected to be agreed to by the reorganized Mason/Dixon under the circumstances. This Court finds that confirmation of the Restated Joint Plan is not likely to be followed by liquidation or the need for further financial reorganization of Mason/Dixon. The Restated Joint Plan complies with 11 U.S.C. § 1129(a)(11).

IT IS HEREBY ORDERED that a hearing will be held on March 27, 1986 at 9:30 a.m. pursuant to 11 U.S.C. § 1129(b)(1), to determine whether the Restated Joint Plan should be confirmed notwithstanding the failure to meet the requirements of 11 U.S.C. § 1129(a)(8).

## ORDER CONFIRMING RESTATED JOINT PLAN OF REORGANIZATION

This matter came on for hearing on March 27, 1986 on the request, made pursuant to 11 U.S. § 1129(b)(1), of the proponents of the Restated Joint Plan of Reorganization for the Mason and Dixon Lines, Incorporated, filed by George R. Gilbertson, Trustee for The Mason and Dixon Lines, Incorporated and Central Transport, Inc. as amended February 5, 1986 and as modified March 18, 1986 (the "Restated Joint Plan"), for confirmation of the Restated Joint Plan notwithstanding the failure to meet the requirements of 11 U.S.C. § 1129(a)(8).

The Court notes that these proceedings have, from the outset, involved substantial controversies that were not germane to the reorganization of this Debtor, or this Chapter 11 case. Efforts to reorganize the Debtor have, as a result, been unnecessarily delayed.

The Mason and Dixon Lines, Incorporated ("Mason/Dixon"), a motor freight carrier based in Kingsport, Tennessee, instituted this Chapter 11 case by filing a voluntary petition on March 29, 1984. According to annual reports filed with the ICC, Mason/Dixon incurred losses of $17,000,000 during the two years preceding the filing. Moreover, at the time of the filing Mason/Dixon was in default of its obligations to its largest secured creditor, First National Bank of Boston.

At the time of filing, Mason/Dixon's operations consisted of two divisions, a General Commodities Division and a Special Commodities Division. The General Commodities Division operated out of sixty terminals located both in the northeast and southeast portions of the United States and was by far the larger of the two operating divisions. Additionally, Mason/Dixon owned all the stock of a subsidiary known as The Mason and Dixon Tank Lines, Inc.

In November, 1983 the shareholders of Mason/Dixon contracted to sell their stock

to Central Transport, Inc. ("Central Transport"). On January 9, 1984, Central Transport assumed temporary authority to operate Mason/Dixon in accordance with Interstate Commerce Rules and Regulations. Central Transport is a trucking company located in Sterling Heights, Michigan.

Shortly after the filing, Mason/Dixon proposed unilaterally to modify its contract with its Teamster employees. As a result of differences between Mason/Dixon and the Teamsters, the Teamsters instituted a strike on April 9, 1984 which effectively terminated the entire operations of the General Commodities Division. The strike was terminated on June 21, 1984 with the signing of a memorandum of understanding which was approved by the Court. Upon the conclusion of the strike, the General Commodities Division had no revenues and no readily available sources of revenue. Although Mason/Dixon reinstituted its General Commodities operations, it was not able to do so profitably and the operations of the General Commodities Division were terminated on December 7, 1984.

The operations of the Special Commodities Division continued uninterrupted by the strike and has continued throughout the course of these proceedings generating a marginal profit. The Special Commodities Division operations are conducted primarily through brokers with the use of drivers who are owner/operators. The Special Commodities Division has no terminal facilities outside of Kingsport, Tennessee.

On December 6, 1984, George E. Gilbertson was appointed Trustee for Mason/Dixon. Subsequent to his appointment, he consolidated all the administrative functions at Mason/Dixon's facility in Kingsport, Tennessee.

During the period that Mason/Dixon was a debtor in possession, it had to obtain loans totaling $4,000,000 in order to sustain its operations. The Trustee had to borrow an additional $1,000,000 to assist in paying costs and expenses which had been incurred during the course of this proceeding. All of these loans were approved by the Court and given superpriority status, subject only to professional fees. The federal income tax return for Mason/Dixon for 1984 indicates that it experienced losses in excess of $23,000,000.

The schedules reflect that, at the time of the filing of its petition, Mason/Dixon had secured debt in an amount in excess of $18,000,000 and unsecured debt in excess of $12,000,000. Although the secured debt has been reduced through the process of the liquidation of rolling stock and other tangible assets which had been used in the operations of the General Commodities Division and through the collection of accounts receivable, it appears that the outstanding general unsecured debt actually approximates $18,000,000. Moreover, withdrawal liability claims arising under the Multiemployer Pension Plan Amendments Act of 1980 have also been asserted against Mason/Dixon. The Central States, Southeast and Southwest, Areas Pension Fund (the "Central States Fund") alone asserts a withdrawal liability claim in the amount of $26,295,533.25.

On September 6, 1985 the Trustee and Central Transport filed a joint plan of reorganization and disclosure statement. Although this particular plan was not approved by the creditors, on November 12, 1985, the joint disclosure statement as amended was approved by the Court. On January 23, 1986, the Trustee and Central Transport filed the Restated Joint Plan which, after being amended on February 5, 1986, was transmitted to creditors and parties in interest for voting.

After proper notice, the Court conducted its initial hearing on confirmation of the Restated Joint Plan on March 18, 1986. On March 25, 1986, the Court entered its Memorandum Opinion and Order (the "Memorandum Opinion") reciting its findings and conclusions to the effect that the Restated Joint Plan complied with all of the requirements of 11 U.S.C. § 1129(a), with the exception of 11 U.S.C. § 1129(a)(8). At the initial hearing on confirmation, the Court found that all impaired classes had indicated their acceptance to the Restated Joint

Plan with the exception of Class 7 which consisted solely of those claimants who were asserting withdrawal liability claims arising under the Multiemployer Pension Plan Amendments Act of 1980. In its Memorandum Opinion, the Court further found and concluded that the classification of all pension withdrawal liability claims in a class separate and apart from general unsecured claims complied with the requirements of 11 U.S.C. §§ 1123 and 1122.

11 U.S.C. § 1129(b)(1) provides in pertinent part as follows:

[I]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted the plan.

At the conclusion of the initial confirmation hearing, the plan proponents requested that the Court conduct a hearing pursuant to the provisions of 11 U.S.C. § 1129(b)(1), and, in accordance with that request, the confirmation hearing was reconvened on March 27, 1986 for the purpose of hearing additional evidence concerning confirmation of the Restated Joint Plan. During the course of that hearing, the Central States Fund appeared, presented evidence, and objected to the Restated Joint Plan on the grounds that the plan was not fair and equitable and discriminated unfairly against the Class 7 creditors. For the reasons set forth hereinbelow, the Court overrules these objections and determines that the Restated Joint Plan should be confirmed.

The Court, having considered and taken judicial notice of the official court file, and having carefully considered the testimony and evidence presented, as well as the arguments of counsel, makes the following findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052:

1. The findings of fact and conclusions of law contained in the Memorandum Opinion are incorporated herein as though fully set out.

2. Generally, the Restated Joint Plan provides for the cancellation of all outstanding stock and the issuance of new common stock which will be purchased by an entity related to Central Transport for a price of $1,000,000. Also, the Restated Joint Plan contemplates the establishment of a $12,000,000 line of credit to be made available to Mason/Dixon as reorganized by GLS LeasCo, an affiliate of Central Transport. The equity investment and proceeds from the line of credit will be utilized by Mason/Dixon to pay the undisputed portion of the claim of First National Bank of Boston, all allowed administrative claims, the superpriority claims of the post-petition lender, and priority wage and employee benefit claims, the aggregate of which could exceed $10,800,000. Moreover, the Restated Joint Plan provides that the cost of administration claims of Central Transport and related companies, estimated to amount to $3,900,000, would be paid by the issuance of debentures. The Class 6 general unsecured claimants would be paid by the issuance of Class B Preferred Stock, Series 1. Class 7 claims would be paid with the issuance of Class B Preferred Stock, Series 2. The Restated Joint Plan makes no distinction between the attributes of Class B Preferred Stock Series 1 and Series 2. This stock will be issued on the basis of one share for each dollar of allowed claim. Mason/Dixon is required to redeem all Class B Preferred Stock, Series 1 and Series 2, at the end of twenty years after the effective date of the Plan by paying to the holder of the stock 100% of its par value.

3. The Amended Joint Disclosure Statement makes known that there exists an entity which is willing to purchase up to 20,000,000 shares of the Class B Preferred Stock, Series 1, for a cash price equal to ten (10%) percent of the value of the stock.

4. If the assets of Mason/Dixon were to be liquidated, it is estimated that after payment of secured creditors and after

making an allowance for liquidation expenses, there would be approximately $7,000,000 available for distribution to all non-secured creditors. Since the total aggregate amount of cost of administration and priority claims equals $16,700,000 (including the $3,900,000 in cost of administration claims and $3,000,000 in priority tax claims otherwise deferred under the Joint Restated Plan), there is absolutely no chance that any unsecured creditor would receive anything. As a practical matter, upon liquidation, most cost of administration claimants would receive less than 20% of their claims.

5. Much evidence was presented concerning the net operating losses of Mason/Dixon and their potential benefit to the purchaser of the new common stock. The aggregate pre–1984 net operating losses of Mason/Dixon which may possibly be carried forward for purposes of federal income taxation to years after 1984 approximate $18,000,000. The losses for 1984, are approximately $23,000,000. Although the tax attributes of Mason/Dixon may have some value to the purchaser, any such value would be highly speculative because so many conditions need to be satisfied prior to their being used. The tax attributes are not marketable and the Court can attribute no value to them for the purpose of making a determination in this case under 11 U.S.C. § 1129(b).

6. Based upon the expert testimony presented by Central Transport and Central States Fund, the Court finds that Mason/Dixon currently has no value. The equity contribution by the purchaser (CenTra, Inc., or its designee), together with advances on the line of credit, will be used to fund the initial distributions to creditors under the Restated Joint Plan. From the evidence presented, the Court is convinced and therefore finds that the value of the common stock of the reorganized Mason/Dixon to be issued to CenTra, Inc. or its designee is unquestionably less than the amount to be paid for such common stock under the Restated Joint Plan.

7. The Court has heard and considered evidence concerning the value of the Class B Preferred Stock to be issued under the Restated Joint Plan. Unsecured creditors would receive nothing on liquidation of Mason/Dixon. The Court finds that the Class B Preferred Stock has a value greater than the amount that the holders of Class 6 and Class 7 claims would receive upon liquidation of Mason/Dixon. On the basis of the evidence presented, the Court finds that the present value of any payment to be made 20 years from confirmation would approximate ten percent of the amount of that future payment. This percentage is reached by applying a discount factor of 11.5% which this Court considers reasonable under the circumstances. A discount factor of 15% for the same 20 year period would yield a present value of approximately 5.5% of the amount of that future payment.

8. The Restated Joint Plan does not discriminate unfairly against any class of claims that is impaired under and has not accepted the Restated Joint Plan. Although classified separately the holders of Class 6 claims (who did accept the Restated Joint Plan as a Class) and the holders of Class 7 Claims (who did not accept the Restated Joint Plan as a Class) will receive Class B, Series 1 Preferred Stock and Class B, Series 2 Preferred Stock respectively. The Class B Series 1 and Series 2 Preferred Stock have identical attributes. As a result, there is no unfair discrimination between those classes as a matter of law.

9. The Restated Joint Plan is fair and equitable with respect to each class of claims or interest that is impaired under and has not accepted the Restated Joint Plan. Under the Restated Joint Plan, the uncontested portion of the secured claim of First National Bank of Boston, the First Superpriority Loan and the Second Superpriority Loan made by GLS LeasCo, Inc., all allowed cost of administration claims and all wage and employee benefit priority claims will be paid in full, in cash on the Effective Date of the Restated Joint Plan. Additionally, provisions have been made to

ensure that additional cost of administration claims which may hereafter be allowed by this Court will be paid within a reasonable time after such allowance. Mason/Dixon, without the Restated Joint Plan, offers the Class 6 and Class 7 creditors a certainty of nothing, so to the extent that the fair and equitable test of 11 U.S.C. § 1129(b) applies in this case, the test is satisfied.

10. The Court further finds that under the Plan no class of claims or interest which is junior to the claims of Classes 6 and 7 will receive or retain any property under the Restated Joint Plan on account of such junior interest.

11. The Effective Date of the Plan is the date upon which the Confirmation Order becomes a Final Order.

12. "Final Order" as used herein shall mean an order of this Court which has not been reversed, stayed, modified or amended and as to which the time to appeal or seek certiorari or review has expired.

13. "Closing Date" as used herein shall mean that date upon which this Confirmation Order becomes a Final Order.

Based on the foregoing and for other good and sufficient cause shown, it is ORDERED AND ADJUDGED that:

A. The Restated Joint Plan of Reorganization for Mason/Dixon filed by Central Transport and the Trustee on January 23, 1986, as amended by the proponents on February 5, 1986 and, as further amended by those modifications reflected in this Court's Memorandum Opinion of March 25, 1986, is confirmed.

B. The provisions of the Restated Joint Plan bind Mason/Dixon and all creditors and equity security holders of Mason/Dixon, including any person that might acquire equity securities of the Debtor.

C. This Order of Confirmation shall have the effect set forth in 11 U.S.C. § 1141 and shall revest in Mason/Dixon as of the Closing Date all of the property of the estate, free and clear of all claims, liens and interests of creditors and of equity security holders except as otherwise provided in (1) the Restated Joint Plan; (2) documents executed and other orders entered in connection with this Restated Joint Plan; and (3) this Order. Except as otherwise provided in the Restated Joint Plan, documents and other orders executed in connection with the Plan and in this Order, this Order discharges Mason/Dixon from any debt that arose before the date of such confirmation and any debt of the kind specified in 11 U.S.C. § 502(g), (h) or (i). All creditors whose debts are discharged by this Order are permanently enjoined from instituting or continuing any action or employing any process to collect such debts as personal liabilities of Mason/Dixon.

D. The lien of First National Bank of Boston (FNBB) is preserved and shall continue in the assets of Mason/Dixon as provided in the Restated Joint Plan; provided, however, that Mason/Dixon may use the proceeds of accounts receivable in the ordinary course of its business until the further order of this Court.

E. Mason/Dixon hereby is authorized to enter into the GLS LeasCo, Inc. Loan Agreement and to grant the security interests described therein subject, however, to the prior security interests of FNBB.

F. All executory contracts and unexpired leases of the Debtor existing as of March 29, 1984, which have not previously been assumed in writing by Mason/Dixon or which are not the subject of a motion for assumption as of the Effective Date are hereby rejected, and all creditors having a claim against Mason/Dixon by reason of such rejection may file proofs of such claims within 30 days from the date of this Order. If such proofs of claims are not filed within such time, such claims shall be forever barred.

G. This Court shall retain jurisdiction of this matter for all purposes set forth in

Section IX of the Restated Joint Plan, including, without limitation, jurisdiction to allow and disallow claims arising prior to the date of this Order and jurisdiction to hear and determine all controversies existing as of the date hereof.