**In re PHEOLL MANUFACTURING COMPANY, a Delaware corporation, a/k/a Pheoll of Michigan and Frankfort Manufacturing, Debtor.**

**Bankruptcy No. 91 B 03040.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

July 3, 1991.

Stephen Bobo of Towbin & Zazove, Chicago, Ill., for debtor.

Solomon I. Hirsh, Chicago, Ill., and Julia P. Clark of Bredhoff & Kaiser, Washington, D.C., for Nat. Indus. Group Pension Plan [NIGPP].

## MEMORANDUM OPINION

DAVID H. COAR, Bankruptcy Judge.

This matter comes before the Court on the Debtor's Motion to Equitably Subordinate the Withdrawal Liability Claim of the National Industrial Group Pension Plan. The Court, having reviewed the record, the stipulation of facts, and the memoranda submitted by the parties, now makes its ruling.

## FINDINGS OF FACT

The facts are not in dispute and the parties have submitted a stipulation of facts upon which the following findings are primarily based.

Pheoll Manufacturing Company [Pheoll] was formerly engaged in the business of manufacturing specialty fasteners. On or about August 10, 1990, Pheoll began the orderly termination of its business and the liquidation of its assets. These measures were undertaken as a result of the expiration of Pheoll's borrowing agreement with its principal lender and the unavailability of replacement financing. On February 12, 1991 Pheoll filed a bankruptcy petition under chapter 11. Concurrently with this petition, Pheoll filed a plan in which it proposed to sell or liquidate all of its assets. The plan also provided for the creation of ten classes of claims, with only the first five to be fully satisfied.

During the course of its business operations, and as required by certain collective bargaining agreements, Pheoll was a participant in a multiemployer pension plan administered by the National Industrial Group Pension Plan [NIGPP]. Pheoll ceased making pension contribution payments to NIGPP on behalf of its employees as of approximately August 10, 1990. In October of 1990 NIGPP notified Pheoll that it owed statutory withdrawal liability to NIGPP in the amount of $1,586,166.56 because Pheoll had allegedly withdrawn from the plan within the meaning of the Employee Retirement Income Security Act as amended by the Multi–Employer Pension Plan Amendments Act of 1980.

In November of 1990 NIGPP and its Board of Trustees commenced a lawsuit against Pheoll to collect the alleged withdrawal liability in the United States District Court for the Northern District of Illinois. That action was stayed by the filing of this chapter 11 case and has since been dismissed without prejudice. NIGPP's motion to reinstate its suit has been taken under advisement.

Pheoll contested NIGPP's assessment of withdrawal liability on several grounds. In December of 1990, NIGPP recalculated the withdrawal liability and reduced it to $1,000,007.77. NIGPP has filed a claim in Pheoll's chapter 11 case for $1,000,007.16.

After informal discovery and independent verification by its court approved actuary, Pheoll has determined that NIGPP's calculation of the amount of its alleged withdrawal liability was reasonable. However, there is still a dispute as to the applicability of the fifty percent reduction in withdrawal liability afforded to insolvent employers undergoing liquidation. Accordingly, Pheoll has agreed that it will not challenge NIGPP's withdrawal liability assessment, except to the extent NIGPP

maintains that the fifty percent reduction does not apply.

In its plan Pheoll proposed that NIGPP's claim be equitably subordinated to the claims of the other unsecured creditors. Although the plan does not specify exactly how much NIGPP is to receive, it essentially provides that NIGPP will receive whatever is left after the claims of the other creditors have been paid. NIGPP has objected to the equitable subordination of its claim. Pheoll and NIGPP have stipulated to the resolution of this issue through a motion filed by Pheoll rather than by an adversary proceeding or other procedural mechanism.[1]

## CONCLUSIONS OF LAW

■ In its motion Pheoll argues that, pursuant to 11 U.S.C. § 510(c), NIGPP's withdrawal liability claim should be equitably subordinated to those of the other general unsecured creditors. According to Pheoll, the claims of the other unsecured creditors arose from the provision of valuable goods and services to Pheoll. By contrast, Pheoll asserts, NIGPP's claim is totally unrelated to any direct economic benefit conferred upon Pheoll or to any failure on the part of Pheoll to make its requisite contribution payments. Instead, says Pheoll, NIGPP's claim is a statutory penalty, imposed solely as a result of Pheoll's alleged withdrawal from the fund.

Pheoll concludes that under these circumstances, equity requires that the claims of its other general unsecured creditors be paid from the assets they helped to create, ahead of NIGPP, whose withdrawal liability claim conferred no economic benefit upon Pheoll.

■ The exact contours of the equitable subordination doctrine are unclear in this Circuit. Traditionally, equitable subordination was applied only when there was some wrongful conduct on the part of the creditor. *In the Matter of Virtual Network Services Corp.*, 902 F.2d 1246 (7th Cir.

1990); *See also, Kham & Nates Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir.1990). Equitable subordination usually is a response to efforts by corporate insiders to convert their equity interests into secured debt in anticipation of bankruptcy. *Kham & Nates, supra*, at 1356. In *Virtual Network, supra*, the court approved subordination of a non-insider claim without proof of wrongful conduct. In that case the court "extended principles of equitable subordination to a penalty created by operation of law, where delay in collecting the penalty injured other creditors." *Kham & Nates, supra* (Describing the holding in *Virtual Network*).

In the instant case there are no allegations that NIGPP is an insider, that it engaged in wrongful conduct, or that there was a delay which harmed other creditors. Therefore, Pheoll's case will pass muster only if the withdrawal liability is a penalty and if the penal nature of a debt is, without more, sufficient grounds for imposing equitable subordination. Based on the following analysis, the Court concludes that Pheoll has failed to establish that the withdrawal liability is a penalty. Rather, it is a debt imposed on Pheoll to compensate NIGPP for providing Pheoll with a valuable benefit. Consequently, there is no reason to reach the issue of whether the mere penal nature of a debt is sufficient grounds for imposing equitable subordination.

Multiemployer pension plans are regulated by the Multiemployer Pension Plan Amendments Act of 1980 (the MPPAA). Pub.L. 96–364 (codified in scattered sections of 29 U.S.C.). This Act establishes a comprehensive scheme under which all multiemployer pension plans must operate. Its primary purpose "is to protect retirees and workers who are participants in such plans against the loss of their pensions." H.R.Rep. No. 96–869, Part I, 96th Cong., 2d Sess. 51, *reprinted in* 1980 U.S.Code Cong. & Admin.News, 2918, 2919.

However, in *In the Matter of Pence*, 905 F.2d 1107 (7th Cir.1990), the court held that a party may waive its right to an adversary proceeding.

---

1. Under Bankruptcy Rule 7001 a proceeding "to subordinate any allowed claim or interest, except where subordination is provided in a chapter 9, 11, or 13 plan" is an adversary proceeding.

For present purposes, the most important aspect of the MPPAA is its withdrawal liability provision. 29 U.S.C. § 1381 et seq. Withdrawal liability refers to the obligation incurred by an employer upon its withdrawal from a multiemployer pension plan, to which it previously made periodic payments towards its employees' insurance and pensions, to make a lump sum payment of additional money to the fund. *Trustees of the Amalgamated Insurance Fund v. McFarlin's, Inc.,* 789 F.2d 98, 99 (2nd Cir. 1986). Withdrawal liability was created by Congress because of the financial hardships imposed upon a multiemployer pension plan when an employer prematurely withdraws.

The House Report accompanying the MPPAA provides evidence of the nature of Congress' dual concerns at the time of the MPPAA's passage. Commenting on the legislation in effect prior to the passage of the MPPAA, this report stated:

> The current rules for employer liability upon the withdrawal of the employer are inequitable and disfunctional because: (1) employers who withdraw from a plan early are rewarded, while employers who remain with a plan are penalized, and (2) there is no provision for compensation to a multiemployer plan for a withdrawal. Under the current rules, when a contributor to a multiemployer plan withdraws from the plan, its share of the funding burden must be picked up by the remaining employers. Thus withdrawals contribute to the escalation of contribution rates and unfairly burden remaining contributors with unfunded benefit obligations left behind by the withdrawn employer.

H.R.Rep. No. 96–869, Part I, 96th Cong., 2d Sess. 60, *reprinted in* 1980 U.S.Code Cong. & Admin.News, 2918, 2928; *see also,* 29 U.S.C. § 1001a(a)(4). Congress was also concerned at the time of the MPPAA's passage, that if withdrawal liability were not imposed, the remaining employer contributors "would be unable to shoulder the increased burden caused by withdrawals." *Trustees of the Amalgamated Insurance Fund, supra* at 100. If this were to hap-

pen, Congress feared, it might cause some multiemployer plans to collapse. *Id.*

In light of these goals, Congress established a method for determining the amount of an employer's withdrawal liability based on the requirement that "a withdrawing employer continue funding a proportional share of the plan's unfunded benefit obligations." H.R.Rep. No. 96–869, Part I, 96th Cong., 2d Sess. 67, *reprinted in* 1980 U.S.Code Cong. & Admin.News, 2918, 2935. "The withdrawal payment is not made by the withdrawing employer to his own employees, but to the [pension fund] to help defray the total unfunded vested liability of the pension plan to which he had been contributing." *Trustees of the Amalgamated Insurance Fund, supra* at 100.

Pheoll contends that because withdrawal liability payments are calculated on the basis of the needs of a pension plan as a whole, and used for the benefit of these plans as a whole, it follows that these payments are not imposed on the basis of NIGPP's provision of valuable goods or services to Pheoll. Therefore, says Pheoll, NIGPP's claim is a penalty which is less deserving of payment than are those of the other general unsecured creditors.

In support of its position Pheoll cites *In re Mason & Dixon Lines, Inc.,* 63 B.R. 176 (Bkrtcy.M.D.N.C.1986), *app. dismissed,* 68 B.R. 95 (M.D.N.C.1986), *app. dismissed,* 841 F.2d 92 (4th Cir.1988). In that case the court held that under 11 U.S.C. §§ 1122, 1123, and 1129(a)(1) it was permissible to place withdrawal claims in a different class than that of the other unsecured creditors. It based its holding on reasoning substantially similar to that used by Pheoll to support its position. But Pheoll fails to explain why the *Mason & Dixon Lines* holding is applicable to the instant case. To hold that withdrawal claims may be treated differently from other unsecured claims is a far cry from holding that withdrawal claims should or must be subordinated. But even assuming that *Mason & Dixon Lines* is on point, the Court does not find its reasoning or that of Pheoll compel-

ling and declines to apply that reasoning to the instant case.

In affirming the subordination of a non-pecuniary tax loss penalty in *Virtual Network*, the Seventh Circuit approved the district court's analysis of § 510(c)(1) and in particular the significance of the statement of Representative Edwards, sponsor of the House Bill:

> It is intended that the term, "principles of equitable subordination" follow existing case law and leave to the courts development of this principle. To date, under existing law, a claim is generally subordinated only if [the] holder of such claim is guilty of inequitable conduct, or the claim itself is of a status susceptible to subordination, such as a penalty ...

*Virtual Network, supra,* at 1248 (quoting from 124 Cong.Rec. H11,089–H11,117 (daily ed. Sept. 28, 1978), *reprinted in,* 1978 U.S.Code Cong. & Admin.News 5787, 6452).

Thus, *Virtual Network* may be read as recognizing the possibility of subordinating a non-penalty claim without proof of inequitable conduct if the "claim itself is of a status susceptible to subordination." Neither Congressman Edwards nor the Seventh Circuit provides any guidance as to the types of claims which might fit this description. However, for the same reasons that this Court concludes the liability involved here is not a penalty, it is not "susceptible to subordination."

■ In order for a claim to be a "penalty" it must be imposed to deter and/or punish. *See Virtual Network, supra* at 1249. In other words, it must be imposed, not due to the creditor's right to receive money from the debtor, but due to the creditor's right to influence the behavior of the debtor (and any other parties whose behavior would be influenced by observing the penalty that is imposed on the debtor as a result of his behavior). When a penalty is imposed, the creditor's receipt of money from the debtor is incidental to the penalty's primary purpose. What is important is that the debtor is forced to pay. If penalty claims should be equitably subordi-

nated, it is because once a debtor is in bankruptcy, the penalty may lose its purpose. If the bankruptcy estate has more liabilities than assets, imposing a penalty will only harm the unsecured creditors.

■ In *Virtual Network* the IRS asserted a tax penalty claim against the debtor. Finding that the provisions in the tax code under which this claim was brought were meant to deter and punish, the court rejected the IRS's attempt to recharacterize the tax penalty as a simple tax claim. In the instant case, by contrast, the MPPAA withdrawal liability provision was enacted by Congress as part of an attempt, via the passage of the MPPAA as a whole, to insure the payment of pension benefits to employees and impose a fair burden on employers. Its primary purpose was not to deter and punish but to provide Pheoll's employees with what in essence is pension insurance. *See, Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. Thompson Building Materials, Inc.,* 749 F.2d 1396, 1407 (9th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 481 (1985).[2]

Withdrawal liability is imposed because an employer's withdrawal from a pension plan damages that plan's future ability to meet its obligations. Congress' purpose in imposing withdrawal liability was to force the withdrawing employee to pay an amount equal to the amount of that damage. The amount which is equivalent to this damage is necessarily an estimate. No one has yet come up with a reliable method for predicting the future. Nonetheless, its status as an estimate makes the payment of withdrawal liability no less necessary to NIGPP's financial well being and therefore to protecting the pension benefits of participating employees.

Thus, withdrawal liability is imposed as Pheoll's share of insuring that Pheoll's employees are part of a viable pension plan. The court in *Mason and Dixon Lines, supra* is incorrect when it asserts that its imposition "is not based upon a consideration or value received by the debtor or its employees." *Id.* at 182. Withdrawal liabil-

2. Contrary to NIGPP's assertion, *Thompson*     *Building Materials* is not a Seventh Circuit case.

ity is a debt like any other and is not a penalty. *See also, Granada Wines, Inc. v. New England Teamsters and Trucking Industry Pension Fund,* 748 F.2d 42 (1st Cir.1984) (Coffin, J.) (Holding that Congress intended withdrawal liability to be treated like any other unsecured claim under Chapter 11).

To be sure, in individual situations it is possible that an employer withdrawing from a plan will be compelled to pay withdrawal liability, not because that employer has not paid his fair share, but because other employers have not paid their fair share, or because the pension plan has made a bad investment decision. But the existence of this possibility is irrelevant. The very purpose of the MPPAA, like any other insurance scheme, is to pool risk. Under some circumstances Pheoll may pay more than its proportionate share. Under others it may pay less. In either event Pheoll's employees are benefitted by being part of a pension plan which is more likely to be fully funded than if that plan depended solely upon the financial well being of Pheoll.

Moreover, it will not do to argue that NIGPP is in no danger of becoming insolvent due to Pheoll's withdrawal. To begin with, there is no way of knowing now whether this is true. Withdrawal liability was created with this uncertainty in mind. The Court will not interfere with Congress' resolution of this issue. Furthermore, even if it were true that NIGPP were not in any danger, equitably subordinating its withdrawal liability claim would be unfair to the other employers. Withdrawal liability is imposed as part of a plan to fairly distribute among the participating employers the costs of insuring that pension benefits are paid to participating employees. These employers have a claim to assert that is just as worthy as those of Pheoll's other unsecured creditors. They all bear the risk that other employers will default or that the pension plan will make a poor investment decision. The result of equitably subordinating a withdrawal liability claim is to increase rather than decrease the amount of unfairness which must be spread amongst the remaining employers.

This is certainly not the purpose of equitable subordination.

Further supporting the conclusion that NIGPP's claim should not be equitably subordinated is the fact that Congress enacted the MPPAA in part due to its concern about the viability of multiemployer pension plans in declining industries. H.R.Rep. No. 96–869, Part I, 96th Cong., 2d Sess. 53–54, *reprinted in* 1980 U.S.Code Cong. & Admin.News, 2918, 2921–2923; 29 U.S.C. § 1001a(a)(4)(B). Since one would expect a large number of bankruptcy filings in declining industries, equitably subordinating withdrawal liability claims would interfere with this Congressional purpose. The Court is not inclined to interfere.

It is true that Congress created withdrawal liability partly for the purpose of discouraging employers from withdrawing from pension plans in the first place. *Peick v. Pension Benefit Guaranty Corporation,* 724 F.2d 1247, 1267 (7th Cir. 1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984); H.R.Rep. No. 96–869, Part I, 96th Cong., 2d Sess. 67, *reprinted in* 1980 U.S.Code Cong. & Admin.News, 2918, 2935. To the extent that this is so, Pheoll can argue that withdrawal liability is a penalty. But providing a disincentive for employers to withdraw from pension plans to which they belong was only part of Congress' intent in creating withdrawal liability. Congress was also concerned with maintaining the viability of multiemployer pension plans where an employer was not deterred from withdrawing. After reviewing the MPPAA and its legislative history, the Court concludes that the essential purpose of Congress was compensatory, not punitive.

But even if the Court could not divine the essence of Congressional motivation, it is doubtful whether it is meaningful to identify the goal of discouraging employer withdrawal as being separate from the goal of protecting the financial well being of pension plans. Imposing withdrawal liability in an amount necessary to protect pension plans will necessarily discourage employer withdrawal. That Congress may

have preferred employers not to withdraw, their payment of withdrawal liability notwithstanding, is not particularly important in the present context. What is important is that they did not fulfill this goal by imposing withdrawal liability in an amount greater than necessary to compensate for the damage caused by withdrawal.

Finally, to the extent that Congress intended withdrawing employers in bankruptcy to be treated differently than those not in bankruptcy, there is no need for the Court to infer the existence and nature of this intent. 29 U.S.C. § 1405(b) of the MPPAA explicitly addresses the issue of the withdrawal liability of an insolvent employer undergoing liquidation or dissolution. Indeed, as the court in *Granada Wines, supra,* points out, Congress makes an express reference to the Bankruptcy Code in 29 U.S.C. § 1405(a). Yet § 1405 does not make any provision for equitably subordinating withdrawal liability claims. Consequently, to hold in favor of Pheoll the Court would have to write its own addition into § 1405. *See, Granada Wines, supra* (Holding that the existence of § 1405 shows that Congress presumably rejected the idea of treating withdrawal liability claims differently than any other unsecured claim). This the Court declines to do.

The Court is not persuaded by Pheoll's argument that NIGPP is equitably estopped from relying on § 1405(b). According to Pheoll, NIGPP is estopped because of its efforts to establish that 1405(b) does not apply to Pheoll. In Pheoll's view NIGPP may not simultaneously rely on § 1405(b) and assert that it is not applicable. But Pheoll mischaracterizes the nature of NIGPP's reliance on § 1405(b). For present purposes the importance of § 1405(b) is that it addresses the issue of insolvent employers undergoing liquidation or dissolution. It therefore constitutes compelling evidence that Congress considered whether and how these employers should be treated differently. If it turns out that NIGPP is correct and § 1405(b) does not apply to Pheoll, § 1405(b) will be no less compelling in this regard. Instead, it will simply demonstrate that in Congress' view Pheoll's insolvency problems do not

entitle Pheoll to special treatment, regardless of its bankruptcy status.

Indeed, Pheoll's argument is backwards. According to Pheoll, that § 1405(b) does not apply to it, constitutes support for equitably subordinating NIGPP's claim. But if Congress considered giving an employer in Pheoll's situation special treatment and decided not to, Pheoll's position is weaker, not stronger. Were this Court to equitably subordinate NIGPP's claim in the situation where § 1405(b) did not apply, it would effectively accomplish what Congress had decided should not be accomplished. In other words, it would give Pheoll special treatment in precisely the situation in which Congress intended that no special treatment be given.

Even were this Court otherwise inclined to find in favor of Pheoll, it would be hard pressed to do so in light of the 7th Circuit's holding in *Peick v. Pension Benefit Guaranty Corporation, supra.* In that case a number of parties involved with the Local 705 International Brotherhood of Teamsters Pension Fund [705 Fund] brought suit against the Pension Benefit Guaranty Corporation [PBGC]. The plaintiffs had entered into the 705 Fund before Congress had created withdrawal liability pursuant to the MPPAA. In their suit they alleged, among other things, that the imposition of withdrawal liability on them was unconstitutional because it was being applied retroactively.

According to the court in *Peick,* Congress could impose retroactive changes in the obligations of employers belonging to the 705 Fund, so long as these changes did not violate the plaintiff's due process rights by being irrational or arbitrary. Imposing withdrawal liability retroactively did not violate the plaintiff's due process rights, said the court. In enacting a withdrawal liability provision, Congress made a rational decision as to how best to solve the problems facing multiemployer pension plans. The court rejected the plaintiffs' argument that the evidence available to Congress concerning the true risks which withdrawals posed was not sufficiently "hard":

Congress has no obligation to wait until a potential problem matures into an actual crisis before enacting corrective legislation addressing the problem. Congress acted rationally in choosing to try to forestall future pension crises involving millions of workers by essentially forcing withdrawing employers to fully fund future pension liabilities.

*Id.* at 1268.

In the instant case Pheoll asks that withdrawal liability be accorded a lower status than the claims of the other general unsecured creditors. Yet in *Peick* the court held that withdrawal liability could be imposed retroactively without violating due process. By doing so, it necessarily concluded that the financial well being of multiemployer pension plans is more important than is a party's right to the benefit of his bargain. It thus makes little sense to conclude that withdrawal liability is less deserving of payment than are the claims of other general unsecured creditors. Withdrawal liability is either important to the well being of multiemployer pension plans or it is not. If the former is true, then withdrawal liability may be imposed retroactively and pension plans should not be the last creditor of an employer in bankruptcy to get paid.

Moreover, the *Peick* court reached it holding in spite of the plaintiffs' argument that Congress based its decision to impose withdrawal liability on projections about the future viability of multiemployer pensions plans rather than on the need to prevent an imminent crisis. Part of Pheoll's argument is that NIGPP's claim is less deserving because there is no direct connection between that claim and any benefit to Pheoll. If a general concern about the future viability of multiemployer pension plans is sufficient for the retroactive imposition of withdrawal liability, then it is difficult to argue that a claim's status should be lowered because it is imposed

due to a general concern that NIGPP survive as a viable plan.

The Court does not find at all relevant the parties' argument over whether or not Pheoll's withdrawal liability will be used to cover shortfalls in the plan which are attributable to insufficient payments into it by Pheoll. Regardless of the answer to this question, there is no basis for equitably subordinating the withdrawal liability. Indeed, the Court is puzzled by NIGPP's very unconvincing attempt to establish that Pheoll's withdrawal liability will only be used to cover plan expenses incurred by Pheoll employees.

According to NIGPP, the accumulated value of contributions made by Pheoll is $4,210,706, while the present value of the vested benefits earned by Pheoll's employees is $4,364,095.[3] This means that Pheoll's contributions fall $153,389 short of paying for the vested benefits earned by Pheoll's employees. Since Pheoll's withdrawal liability is $1,000,007, this leaves over $800,000 which will not pay for the vested benefits of Pheoll's employees. NIGPP asserts that this $800,000+ will not be used to fund the unfunded vested benefits of employees of other employers.

According to NIGPP, this money will be used to fund prior disbursements for Pheoll's fair share of plan operating expenses or for benefits already distributed to retired Pheoll employees. It will not be used for the employees of other employers, says NIGPP, because with respect to them the plan is fully funded. But NIGPP does not bother to specify how much money will be used to pay for the prior disbursements and benefits in question. Nor does it explain how it came about that the plan is fully funded with respect to other employees, but not with respect to the employees of Pheoll.[4] Finally, it ignores the fact that withdrawal liability is supposed to be determined on the basis of the withdrawing employer's proportionate share of the plan's

---

**3.** NIGPP's arguments with respect to the use of Pheoll's withdrawal liability are based primarily on the declaration of John Slowata, an actuary employed by the Prudential Asset Management Company [PAMC]. PAMC administers NIGPP.

**4.** NIGPP's assertion that it is fully funded with respect to all non-Pheoll employees is especially curious given NIGPP's later assertion that multiemployer pension funds will always have unfunded liabilities.

unfunded vested liability. *Peick, supra* at 1255–1256.

 Fortunately for NIGPP, the correctness of its position is not based upon its argument that Pheoll's withdrawal liability will only be used to pay for plan expenses incurred by Pheoll employees. While NIGPP's strange explanations raise questions in the Court's mind as to how it calculated Pheoll's withdrawal liability, this issue is not before the Court. If NIGPP's claim was miscalculated, it should be disallowed to the extent it is excessive, not equitably subordinated. Furthermore, the parties have already agreed that Pheoll's withdrawal liability has been calculated correctly.

Accordingly, for the reasons stated above, the Court will not equitably subordinate NIGPP's withdrawal liability claim.