**In the Matter of COTT CORPORATION, Debtor.**

**Bankruptcy No. 2–80–00657.**

United States Bankruptcy Court, D. Connecticut.

Nov. 21, 1984.

See also 26 B.R. 332.

Norman Zolot, Hamden, Conn., for New England Teamsters & Trucking Industry Pension Fund, claimant.

Richard F. Casher, and Evan D. Flaschen, Hebb & Gitlin, P.C., Hartford, Conn., for debtor.

## MEMORANDUM AND ORDER RE: PROCEEDING TO DETERMINE PRIORITY STATUS OF "ERISA" WITHDRAWAL LIABILITY CLAIM

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

### I.

#### Issue

This ruling deals with an objection by Cott Corporation (Cott), the debtor in this chapter 11 case, to a proof of claim filed by the New England Teamsters and Trucking Industry Pension Fund (Fund). By agreement of the parties, the sole issue for resolution at this time is whether, or to what extent, the Fund's proof of claim may be accorded priority as an expense of administration under the Bankruptcy Code (Code) §§ 503(b)(1)(A) [1] and 507(a)(1) [2] or be classified as a prepetition, nonpriority, unsecured claim.

### II.

#### Background
##### A.

The following factual background, derived from the pleadings and the comprehensive memoranda filed by the parties, is not in dispute. There has not been an evidentiary hearing. Cott, then known as Cott Acquisition Corporation, on December 28, 1978, purchased certain businesses and became obligated under five collective bar-

---

**1.** Section 503(b) provides:
"After notice and a hearing, there shall be allowed, administrative expenses ... including—
(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case."

**2.** Section 507(a) provides:
"The following expenses and claims have priority in the following order:
(1) First, administrative expenses allowed under section 503(b) of this title ...."

gaining agreements (collective bargaining agreements), with local unions affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters). Pursuant to the collective bargaining agreements, Cott contributed to the Fund certain amounts measured by the hours worked per week by each covered employee. The Fund is an unincorporated association established in 1958 which, through trustees, administers a program for retirement benefits for the employees of 3,000 employers in New England with 56,000 employees and 18,000 retirees. The trustees of the Fund are fiduciaries under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.*, as amended by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub.L. No. 96–364, 94 Stat. 1208 (1980) (both statutes hereinafter ERISA).

Cott filed a chapter 11 petition for reorganization on June 24, 1980. On February 6, 1981, in contemplation of a sale of its assets, Cott terminated operations and discharged all of its Teamster employees. The bankruptcy court approved the sale of the bulk of Cott's assets on February 26, 1981, and, on the same date, authorized Cott to reject four of the five executory collective bargaining agreements. A buyer of the assets assumed the fifth agreement. At all times involved, until the termination of its operations on February 6, 1981, Cott had paid to the Fund all contributions called for by the collective bargaining agreements.

The Fund filed its original proof of claim on June 18, 1981, alleging that it was enti-

tled to $652,047.00, based upon a "withdrawal liability" imposed on Cott by ERISA and that such amount was "entitled to priority in the second and third order." The Fund, on August 23, 1982, filed a supplemental proof of claim which increased the claim to $2,281,767.00, and asserted a first priority as an expense of administration. Cott objected both to the amount and to the priority of the supplemental claim. This ruling, as noted, deals only with the issue of priority raised by Cott's objection.

### B.

Both parties agree that either when Cott terminated its operations on February 6, 1981, as claimed by the Fund, or when the court authorized the rejection of the executory collective bargaining agreements on February 26, 1981, as claimed by Cott, such actions constituted Cott's complete withdrawal[3] from the multiemployer pension plan[4] administered by the Fund. It thereupon became the Fund's statutory responsibility as the plan's sponsor[5] to determine Cott's withdrawal liability and collect that amount from Cott.[6] The amount of withdrawal liability is based upon the withdrawing employer's allocable portion of the unfunded vested benefits for the plan. ERISA § 1391(c) defines the term "unfunded vested benefits" as "an amount equal to— (A) the value of nonforfeitable benefits under the plan, less (B) the value of the assets of the plan." ERISA § 1391 contains many pages of alternate, detailed formulae for computing the unfunded vested benefits allocable to a withdrawing employer. ERISA § 1405(b) places a limit on withdrawal liability in the case of an insol-

---

**3.** ERISA § 1383 provides in pertinent part:
"[A] complete withdrawal from a multiemployer plan occurs when an employer—
(1) permanently ceases to have an obligation to contribute under the plan, or
(2) permanently ceases all covered operations under the plan."

**4.** ERISA § 1002(37)(A) defines a multiemployer plan as one "(i) to which more than one employer is required to contribute, [and] (ii) which is maintained pursuant to one or more collective bargaining agreements between one or more

employee organizations and more than one employer ...."

**5.** ERISA § 1301(a)(10) defines a plan sponsor as the multiemployer "plan's joint board of trustees," when such a board exists.

**6.** ERISA § 1381(a) provides:
"If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability."

vent employer undergoing liquidation or dissolution.[7]

In sum, these ERISA provisions require a withdrawing employer to fund a proportional share of a plan's unfunded benefit obligations and outline the amount of such share. This amount may vary depending on when the plan's shortage occurred.

## III.

### Summary of Arguments

The Fund argues that Cott's entire withdrawal liability is a postpetition expense in Cott's bankruptcy estate because the cessation of Cott's operation, approximately six months after the filing of the bankruptcy petition, became the triggering event for this liability under ERISA § 1383(a). *See supra* footnote 3. Prior to the filing of the petition, the Fund asserts it had no claim. The Fund contends that the claim was an actual and necessary cost of preserving Cott's estate because the postpetition employment of the Teamster employees kept the business going until a favorable sale of the assets could be achieved. The Fund alleges that a prime purpose of MPPAA's

enactment was to insure benefits for the employee-participants despite an employer's withdrawal from the plan, and this purpose will be thwarted unless withdrawal liability is provided a priority position in bankruptcy cases. Since Congress, in drafting MPPAA did not specifically address the priority status of withdrawal liability occurring postpetition in employer reorganizations, the Fund asserts an analogy to the severance pay cases decided by the court of appeals in this circuit where severance pay was granted administrative expense priority when employees were discharged postpetition. As for ERISA § 1405(b), *see supra* footnote 7, the Fund says that section applies only to a chapter 7 liquidation and not to a chapter 11 reorganization when there is postpetition business operation.[8]

Cott responds to these arguments as follows. The withdrawal liability relates almost exclusively to services rendered prepetition. This liability was triggered upon the court's approval of the rejection of the executory collective bargaining agreements. Under Code § 365(g),[9] such rejec-

---

7. ERISA § 1405(b). *Unfunded vested benefits allocable to insolvent employer undergoing liquidation or dissolution; maximum amount; determinative factors*

In the case of an insolvent employer undergoing liquidation or dissolution, the unfunded vested benefits allocable to that employer shall not exceed an amount equal to the sum of—

(1) 50% of the unfunded vested benefits allocable to the employer (determined without regard to this section), and

(2) that portion of 50% of the unfunded vested benefits allocable to the employer (as determined under paragraph (1)) which does not exceed the liquidation or dissolution value of the employer determined—

(A) as of the commencement of liquidation or dissolution, and

(B) after reducing the liquidation or dissolution value of the employer by the amount determined under paragraph (1).

8. The Fund quotes on page 9 of its memorandum the following passage from the Senate Committee Report, at p. 15 in support of this contention.

Under the bill, an individual employer undergoing a liquidation or dissolution is always liable for an amount equal to 50% per cent of

his normal withdrawal liability. However, the employer's exposure for the next 50 percent of his normal withdrawal liability is limited to the employer's liquidation or dissolution value. This value is determined by taking the employer's value as of the beginning of the liquidation or dissolution, and reducing that value by an amount equal to the first 50 percent of the employer's normal withdrawal liability. To qualify for this rule, an insolvent employer need not undergo a formal liquidation or dissolution. It must, however, be insolvent and wind up its business affairs. The insolvency limitations applies in the aggregate to total withdrawal liability at the time of insolvency. Thus, where liabilities arise because of withdrawals from several plans, the 50 percent insolvency rule would be applicable to each such liability.

9. Section 365(g) provides in pertinent part:

[T]he rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—

(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, or 13 . . . , immediately before the date of the filing of the petition.

tion relates back to immediately before the date of filing of the bankruptcy petition, and withdrawal liability becomes a prepetition claim. While ERISA creates and fixes the amount of a withdrawal liability claim, it does not in any way supplement or supersede the Code's distribution scheme. Withdrawal liability is not analogous to severance pay, and this circuit's decisions concerning severance pay are inapposite. In short, Cott says that there is no basis whatsoever for finding that the Fund's claim represents postpetition services to the estate qualifying as an administrative expense and that ERISA § 1405(b), *see supra* footnote 7, is the sole provision which applies to the Fund's claim.

### IV.

### *Discussion*

#### A.

#### *Scrutiny Given to Administrative Priority Claims*

■ Court decisions construing both Code § 503(b) and its predecessor provision have uniformly declared administrative claims must be given a high degree of scrutiny. The reason for this is that "[t]he significance of an allowance pursuant to section 503(b)(1)(B) is two-fold: it is not only an allowance against the estate; administrative expense claims enjoy a priority over other claims. Priority statutes are strictly construed." *In re Club Development and Management Corp.*, 27 B.R. 610, 612, 10 Bankr.Ct.Dec. (CRR) 199, Bankr.L.Rep. (CCH) ¶ 69,203 (Bankr. 9th Cir.1982). *See also In re REA Express*, 442 F.Supp. 71, 74 (S.D.N.Y.1977) ("equitable considerations may not be relied upon to vary the strict priorities set out in Section 64(a)");[10] *Goldie v. Cox*, 130 F.2d 690 (8th Cir.1942); *Matter of Jartran, Inc.*, 732 F.2d 584 (7th Cir.1984). A priority claimant has the burden of proving that "those expenses incurred ... preserve the estate for the benefit of *all* creditors." *In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104,

**10.** § 64(a) is analogous to § 503 of the Code.

121 (Bankr.S.D.N.Y.1982) (emphasis in original).

#### B.

#### *Triggering Withdrawal Liability*

■ Both parties in this matter argue that the date of triggering withdrawal liability under ERISA § 1383(a), *see supra* footnote 3, controls the pre- or postpetition nature of the Fund's claim. I conclude, however, that the provisions of ERISA § 1383(a) only signal the point in time from which withdrawal liability is to be calculated and then becomes payable, based on a liability that has accrued over many previous years. In *In re Kessler*, 23 B.R. 722, 9 Bankr.Ct.Dec. (CRR) 943 (Bankr.S.D.N.Y. 1981), one of the very few reported cases in this area, the court rejected administrative priority status for a withdrawal liability claim because "the calculation of withdrawal liability, though triggered post-petition, is based entirely on pre-petition factors." *Id.* at 725. *See also In re Blue Ribbon Delivery Service, Inc.*, 31 B.R. 292 (Bankr. W.D.Ky.1983). *Cf. Otte v. United States*, 419 U.S. 43, 56, 95 S.Ct. 247, 256, 42 L.Ed.2d 212 (1974) (withholding taxes attributable to prepetition wage claims, where wage claims paid postpetition when funds available, do not become expenses of administration even though "they arose during bankruptcy"). It is not clear from the *Kessler* opinion whether there was a postpetition period included in the calculation of liability. If there were no such period, I agree with the *Kessler* holding. If there were a postpetition period involved, I cannot follow *Kessler* completely.

In the present matter, there are three months of postpetition service included in the last plan year (October 1, 1979 to September 30, 1980) on which the Fund calculates its withdrawal liability claim. *See* Exhibit A prepared by the Fund and attached to this memorandum. I believe that the withdrawal liability claim, if possible, should be prorated as to the amount of unfunding that occurred during that year

based upon prepetition and postpetition portions of the year. As the Teamster employees worked postpetition, they acquired pension credits for which the Fund is liable. A portion of these hours of work are reflected in the Cott contributions and, accordingly, included in the statutory calculation of Cott's liability. *See infra Part E—Division of Withdrawal Liability.*

## C.
### Policy of MPPAA

The policy reasons for enacting MPPAA are set out in ERISA § 1001a(c) [11] and boil down to encouraging the growth and financial integrity of multiemployer pension plans. In *R.A. Gray & Co. v. Oregon Washington Carpenters-Employers Pension Trust Fund,* 549 F.Supp. 531, 536 (D.Or.1982), aff'd — U.S. —, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), the court stated:

> [I]mposition of withdrawal liability was intended to remove existing statutory incentives for employers to withdraw from troubled or potentially troubled plans, while providing that newly entering employers would not be saddled with obliga-

tions incurred prior to their entry into the plan ... [and] also ... to insure that a withdrawing employer would fund a share of the obligations incurred during that employer's association with the plan.

*Kessler, supra,* concluded that "Congress did not intend to include an employer's obligation for withdrawal liability within the priority provisions set forth in § 507(a)(1). Rather ... withdrawal liability was established so as to encourage the growth of multiemployer pension plans ...." *Kessler,* at 725.

Cott's memorandum points out that when Congress wished to provide for a priority in bankruptcy cases for ERISA matters, it knew how to do so. ERISA § 1368(c)(2), which applies only to *single-employer pension plans,* provided for a Code § 507(a)(6) priority for certain employer liability to the Pension Benefit Guaranty Corporation (PBGC) [12] on withdrawal from such a plan. [13] Further, ERISA § 1405(a) [14] excludes an employer undergoing reorganization under Title 11 from the limitation on withdrawal liability contained in that particular section. I believe it is clear that ERISA does not, in multiemployer plans,

---

**11.** ERISA § 1001a(c) reads:

It is hereby declared to be the policy of this Act—

(1) to foster and facilitate interstate commerce,

(2) to alleviate certain problems which tend to discourage the maintenance and growth of multiemployer pension plans,

(3) to provide reasonable protection for the interests of participants and beneficiaries of financially distressed multiemployer pension plans, and

(4) to provide a financially self-sufficient program for the guarantee of employee benefits under multiemployer plans.

**12.** ERISA originally set up a pension termination insurance program administered by the Pension Benefit Guaranty Corporation, an independent corporation within the Department of Labor, to assure that payment of nonforfeitable benefits earned by employees under single-employer plans would be made. MPPAA extended the duties of PBGC to multiemployer plans.

**13.** *ERISA § 1368. Lien for liability of employer*
....
(c) *Priority*
(2) In a case under Title 11 or in insolvency proceedings, the lien imposed under subsec-

tion (a) of this section shall be treated in the same manner as a tax due and owing to the United States for purposes of Title 11 or section 191 of Title 31.

**14.** *ERISA § 1405. Limitation on withdrawal liability* (a) *Unfunded vested benefits allocable to employer in bona fide sale of assets of employer in arms-length transaction to unrelated party; maximum amount; determinative factors*

(1) In the case of bona fide sale of all or substantially all of the employer's assets in an arms-length transaction to an unrelated party (within the meaning of section 1384(d) of this title), the unfunded vested benefits allocable to an employer (after the application of all sections of this part having a lower number designation than this section), other than an employer undergoing reorganization under Title 11, or similar provisions of State law, shall not exceed the greater of—

(A) a portion (determined under paragraph (2)) of the liquidation or dissolution value of the employer (determined after the sale or exchange of such assets), or

(B) the unfunded vested benefits attributable to employees of the employer.

provide specifically for priority status in bankruptcy, and I find no conflict between ERISA and the Code that requires an implied modification of the priority provisions of bankruptcy law. The Fund has not advanced any plausible reason why ERISA § 1405(b), *see supra* footnote 7, should not be applied to a liquidation which takes place under chapter 11, as well as one under chapter 7. The theory advanced by the Fund for not applying ERISA § 1405(b) to reorganization cases would present an intolerable obstacle to well-intentioned companies attempting a reorganization rather than immediate liquidation.

### D.

### *Withdrawal Liability Claims as Analogous to Severance Pay Claims*

The Fund argues that, in the absence of a specific legislative priority for withdrawal liability under ERISA and the Code, analogies should be made to the line of cases concerning an administrative priority for employment-severance claims. The primary case relied upon by the Fund is *Straus-Duparquet, Inc. v. Local Union No. 3 International Brotherhood of Electrical Workers, AF of L, CIO*, 386 F.2d 649 (2d Cir.1967), which deals with employee claims against the debtor-employer for vacation pay and severance pay priorities when there were postpetition operations by the debtor under the Bankruptcy Act. Vacation pay was allowed as administrative expense priority to the extent it was earned during the administration of the estate. Severance pay was allowed in full as an administrative expense. The court reasoned that vacation pay accrues from day to day, so that only that portion which was earned postpetition was an administrative expense. Severance pay, the court held, was not earned from day to day but was compensation for an employee's termination. Where the termination occurred "as an incident of the administration of the bankrupt's estate", severance pay became "an expense of administration." *Id.* at 651. The *Straus-Duparquet* holding was followed in *Zelin v. Unishops, Inc. (In re Unishops, Inc.)*, 553 F.2d 305 (2d Cir.1977); and *Rodman v. Rinier (In re W.T. Grant Co.)*, 620 F.2d 319 (2d Cir.1980).

I find the analogy between severance pay and withdrawal liability unconvincing. As mentioned in section B, *supra*, withdrawal liability accrues when the vested pension benefits of a plan become underfunded. As this underfunding varies from day to day, so Cott's contingent withdrawal liability varies. The purpose of severance pay is to compensate an individual employee for the termination of the employee's services, while withdrawal liability is to make up for the failure of the plan to receive contributions in years gone by sufficient to pay for the vested pension benefits. As *Kessler, supra* at 726 noted:

> Withdrawal liability ... is not direct compensation to an employee for termination of his post-petition employment relationship with the debtor in possession. Rather, the withdrawal liability is an obligation of the debtor to the Multi-employer Pension Fund pursuant to the MPPA. Although the employee and other union employees might benefit from the contribution, the liability is not a direct payment to an employee for his post-petition services. Therefore, withdrawal liability, unlike severance, is not entitled to administrative status.

### E.

### *Division of Withdrawal Liability*

A three-pronged question remains: (1) can withdrawal liability logically be divided into pre- and postpetition portions; (2) does the postpetition portion qualify as "costs and expenses of preserving the estate", *see supra* footnote 1; and (3) if the Fund's claim can be divided between pre- and postpetition portions, must it still be taken as a whole.

### (1)

In its memorandum Cott states it agrees with the method adopted by the Fund in calculating the withdrawal liability claim pursuant to ERISA § 1391(b), although Cott disputes the figures utilized by the

Fund. Under this agreed-upon method, a withdrawing employer is charged with a withdrawal liability based upon pension-plan years that ended before April 28, 1980 founded on the plan's total unfunded vested liability. For plan years that end after April 28, 1980, a different formula is used, with the employer becoming obligated for a prorated share of any *increase* in unfunded vested liability that takes place during that year. This is reflected in Exhibit A, where "Pool 1 liability" covers pre-April 28, 1980 plan years and "Pool 2 liability" covers the post-April 28, 1980 plan year. Since Cott filed its bankruptcy petition on June 24, 1980, all of Pool 1 liability would be a prepetition claim. Pool 2 liability covers the plan year October 1, 1979 to September 30, 1980, and, therefore, includes a three-month postpetition period. For this plan year, ERISA § 1391(b)(2)(B) and (E) [15] provide that Cott is liable for the increase in unfunded liability that occurred during that year in a proportion of Cott's contributions during the past five years to the total contributions of all employers during the past five years. Based on the record in this proceeding, I perceive no reason why a calculation cannot be made to divide Pool 2 liability into prepetition and postpetition amounts.

### (2)

In *Kessler, supra* at 724, the court found that withdrawal liability was an obligation the employer had to the Fund, and the employee was only an indirect and potential beneficiary of the payment. *Cf. also In re Pacific Far East Line, Inc.,* 713 F.2d 476, 479 (9th Cir.1983) ("Nor did their entitlement to benefits from the fund ... depend upon whether the employer met its obligations to make the payments.") Based upon these cases, Cott alleges that any postpetition withdrawal liability payments are not a benefit to the estate since the employees are not severed from collecting their benefits, and in any event, PBGC insures the collection of benefits from the Fund. I do not find this position persuasive and conclude that whether third parties (other contributors to the Fund or PBGC) might be responsible payors of an administrative expense does not cause the expense to lose its status as an administrative expense.

### (3)

Cott refers to an unpublished bankruptcy court case *In re Goldblatt,* No. 81–B–707 (N.D.Ill., Nov. 12, 1982), wherein there were six months of postpetition Teamster services, and that court refused to apportion, stating that the entire claim must be allowed or disallowed since "[t]he amount of liability would be the same whether the teamsters were terminated before or after the petition was filed." *Goldblatt, supra* at 5. The calculations done herein, however, show that the pension plan underfunding includes a postpetition period. I

---

**15.** ERISA § 1391. *Method for computing withdrawal liability*

. . . .

(B) The change in a plan's unfunded vested benefits for a plan year is the amount by which—

(i) the unfunded vested benefits at the end of the plan year; exceeds

(ii) the sum of—

(I) the unamortized amount of the unfunded vested benefits for the last plan year ending Before April 29, 1980, and

(II) the sum of the unamortized amounts of the change in unfunded vested benefits for each plan year ending after April 28, 1980, and preceding the plan year for which the change is determined.

. . . .

(E) An employer's proportional share of the unamortized amount of a change in unfunded vested benefits is the product of—

(i) the unamortized amount of such change (as of the end of the plan year preceding the plan year in which the employer withdraws); multiplied by

(ii) a fraction—

(I) the numerator of which is the sum of the contributions required to be made under the plan by the employer for the year in which such change arose and for the 4 preceding plan years, and

(II) the denominator of which is the sum for the plan year in which such change arose and the 4 preceding plan years of all contributions made by employers who had an obligation to contribute under the plan for the plan year in which such change arose reduced by the contributions made in such years by employers who had withdrawn from the plan in the year in which the change arose.

find it only sensible to allow as an administrative priority that share of the Fund's withdrawal liability claim which is proportional to a postpetition period.

## V.

### *Conclusion*

 The objection by Cott to the Fund's assertion of an administrative expense priority is sustained in part. The Fund's withdrawal liability claim does not have priority status as an administrative expense simply because it was triggered postpetition. The claim in this estate can be divided into two amounts based upon the period covered by the claim that was prepetition and the period which was postpetition. The prepetition amount is a general, unsecured claim and the postpetition portion has priority status as an administrative expense. The prepetition portion is subject to the limitations of ERISA § 1405(b), *see supra* footnote 7, with 50 percent of the claim subordinated to all other general, unsecured creditor claims. It is

SO ORDERED.

Exhibit A

Withdrawal Liability Worksheet

For Withdrawals Occurring in the Period
October 1, 1980—September 30, 1981

| | |
|---|---|
| (1) Pool 1 liability | $543,153,500 |
| (2) Total employer contributions net of withdrawn employers 10/1/74–9/30/79 | $273,601,108 |
| (3) Factor A = (1) ÷ (2) | 1.985 |
| (4) Total contributions of withdrawing employer 10/1/74–9/30/79 | $ 633,185 |
| (5) Withdrawal liability — Pool 1 = (3) × (4) | $ 1,256,872 |
| (6) Pool 2 liability | $ 9,544,900 |
| (7) Total employer contributions net of withdrawn employers 10/1/75–9/30/80 | $309,340,286 |
| (8) Factor B = (6) ÷ (7) | 0.031 |
| (9) Total contributions of withdrawing employer 10/1/75–9/30/80 | $ 738,245 |
| (10) Withdrawal liability — Pool 2 = (8) × (9) | $ 22,885 |
| (11) Total withdrawal liability = (5) ÷ (10) | $ 1,279,757 |
| (12) If (11) is less than $50,000, withdrawal liability | $ 0 |
| (13) If (11) is between $50,000 and $100,000, withdrawal liability = (11) − $50,000 | $ – |
| (14) If (11) is between $100,000 and $150,000, withdrawal liability = 2 × (11) − $150,000 | $ – |
| (15) If (11) is greater than $150,000, withdrawal liability = (11) | $ 1,279,757 |
| (16) Average annual number of hours for the three consecutive highest plan years in the 10 years prior to withdrawal | 332,708 |
| (17) Highest contribution rate during last 10 years including year of withdrawal | 55,722 hrs. @ 47¢)<br>137,074 hrs. @ 50¢)<br>$ 139,912 hrs. @ 70¢) |
| (18) Total annual withdrawal liability payment = (16) × (17) | $ 192,664 |