MANSFIELD, Circuit Judge:
 

 The Trustees of the Amalgamated Insurance Fund (“The Fund”) appeal from an order of the Western District of New York, Michael A. Telesca,
 
 Judge,
 
 affirming without opinion a decision of Judge Edward D. Hayes of the bankruptcy court (reported at 46 B.R. 88 (1985)) in the Chapter 11 bankruptcy of McFarlin’s Inc. The decision held that “withdrawal liability” incurred by McFarlin’s under the Multiemployer Pension Plan Amendments Act (MPPAA), 29 U.S.C. §§ 1381(a)
 
 et seq.,
 
 must be asserted by the Fund as a general unsecured claim and hence is not entitled to priority as an expense of administering the estate under the Bankruptcy Code, 11 U.S.C. § 507, or under the MPPAA. We affirm.
 

 “Withdrawal liability” is a term used to describe an employer’s obligation, upon his withdrawing from a multiemployer pension and employee benefit plan requiring him to make periodic payments toward employees’ insurance and pensions, to make a lump sum payment of additional money to the fund. This payment is required to satisfy the employer’s pro rata share of the vested but unfunded benefits to be paid to employees participating in the plan, including those employed by others. The obligation was created by Congress after it found that
 

 “(A) withdrawals of contributing employers from a multiemployer pension plan frequently result in substantially in
 
 *100
 
 creased funding obligations for employers who continue to contribute to the plan, adversely affecting the plan, its participants and beneficiaries, and labor-management relations, and
 

 “(B) in a declining industry, the incidence of employer withdrawals is higher and the adverse effects described in sub-paragraph (A) are exacerbated.” MPPAA § 3(a)(4), 29 U.S.C. § 1001a(a)(4).
 

 Congress was concerned that, unless a withdrawing employer assumed such a liability, the remaining employer participants would be unable to shoulder the increased burden caused by the withdrawal, which might lead to a collapse of the entire multi-employer plan.
 
 See infra
 
 at 102-103. The withdrawal payment is not made by the withdrawing employer to his own employees but to the Fund in order to help defray the total unfunded vested liability of the pension plan to which he had been contributing.
 

 Before filing for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101
 
 et seq.,
 
 McFarlin’s was in the business of altering and selling at retail men’s and boys’ clothing. The employees in its alteration department were represented by the Amalgamated Clothing and Textile Workers Union, AFL-CIO (“Union”). Under its collective bargaining agreement with that union McFarlin’s made weekly contributions amounting to 15% of the gross wages of those employees to the Fund, a multiemployer pension and benefit plan which provided retirement, life, accident and health insurance to the covered employees.
 

 On March 16, 1982, McFarlin’s filed its Chapter 11 petition and was authorized to operate its business as a debtor in possession. Thereafter it maintained its alteration department for a time, employing persons covered by the collective bargaining agreement and making all required contributions to the Fund. On or about November 13,1982, however, McFarlin’s closed its alteration department and, though it retained its sales staff, “effective that date [it] permanently ceased all operations employing employees covered by the Plan.”
 

 Title 29 U.S.C. § 1381(a) provides that if an employer withdraws from a multiem-ployer plan he is liable to the plan in the amount determined under 29 U.S.C. § 1391 to be his “withdrawal liability.” The Trustees of the Fund, after determining that McFarlin’s withdrawal liability was $57,-969.76, filed a claim for that amount in the Chapter 11 proceeding and asserted that the withdrawal liability was an expense of administration entitled to first priority under 11 U.S.C. § 507(a)(1). In response, McFarlin’s Creditor’s Committee requested the bankruptcy court to reclassify the debt as a general unsecured claim.
 

 McFarlin’s thereafter went out of business and the Creditor’s Committee proposed a liquidation plan which was approved by the bankruptcy court on September 1, 1984. Under Article VI of that plan, McFarlin’s rejected all executory contracts, including its collective bargaining agreement with the Union, which it had not confirmed while operating as debtor in possession.
 

 On January 28, 1985, the bankruptcy court ruled that the McFarlin’s withdrawal liability gave rise to a general unsecured claim, not an administrative expense meriting priority over McFarlin’s other debts. The Western District of New York affirmed without opinion.
 

 DISCUSSION
 

 The central question is whether the provisions of the Bankruptcy Code or the MPPAA mandate that McFarlin’s “withdrawal liability” be given first priority among McFarlin’s debts. The Bankruptcy Code, 11 U.S.C. § 507, defines those expenses and claims against a bankrupt estate that are entitled to priority in a bankruptcy proceeding. Because the presumption in bankruptcy cases is that the debt- or’s limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed.
 
 Joint Industry Board v. United States,
 
 391 U.S. 224, 228, 88 S.Ct. 1491, 1493, 20 L.Ed.2d
 
 *101
 
 546 (1968);
 
 In re United Merchants & Manufacturers, Inc.,
 
 597 F.2d 348, 349 (2d Cir.1979);
 
 In re Mammoth Mart, Inc.,
 
 536 F.2d 950, 953 (1st Cir.1976). “[I]f one claimant is to be preferred over others, the purpose should be clear from the statute.”
 
 Nathanson v. N.L.R.B.,
 
 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952).
 
 See also Matter of Jartran, Inc.,
 
 732 F.2d 584, 586 (7th Cir.1984).
 

 Section 507 gives first priority to “administrative expenses allowed under [11 U.S.C.] section 503(b).” Section 503(b)(1)(A) defines administrative expenses as including “the actual, necessary costs and expenses of preserving the estate, including wages, salaries or commissions for services rendered after the commencement of the case.”
 
 [1]
 
 The Fund contends McFarlin’s withdrawal liability satisfies that definition. We disagree.
 

 Congress granted priority to administrative expenses in order to facilitate the efforts of the trustee or debtor in possession to rehabilitate the business for the benefit of all the estate’s creditors.
 
 Mammoth Mart, supra,
 
 536 F.2d at 953.
 
 See also Yorke v. N.L.R.B.,
 
 709 F.2d 1138, 1143 (7th Cir.1983) (administrative expenses arise from operating the estate “in the overall interests of the creditors.”). Congress reasoned that unless the debts incurred by the debtor in possession could be given priority over the debts which forced the estate into bankruptcy in the first place, persons would not do business with the debtor in possession, which would inhibit rehabilitation of the business and thus harm the creditors.
 
 Mammoth Mart, supra,
 
 536 F.2d at 953.
 
 See also Jartran, supra,
 
 732 F.2d at 586;
 
 Matter of Fuzzy Thurston’s Eau Claire Left Guard,
 
 33 B.R. 579, 581 (Bankr., W.D.Wisc.1983).
 

 Accordingly, an expense is administrative only if it arises out of a transaction between the creditor and the bankrupt’s trustee or debtor in possession,
 
 Jartran, supra,
 
 732 F.2d at 587;
 
 Straus-Duparquet, Inc. v. Local U. No. 3 Int. Bro. of Elec. Wkrs.,
 
 386 F.2d 649, 651 (2d Cir.1967) and “only to the extent that the consideration supporting the claimant’s right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.”
 
 Mammoth Mart, supra,
 
 536 F.2d at 954.
 
 See also Jartran, supra,
 
 732 F.2d at 587;
 
 In re Freedomland, Inc.,
 
 480 F.2d 184, 189 (2d Cir.1973);
 
 American A. & B. Coal Corp. v. Leonardo Arrivabene, S.A.,
 
 280 F.2d 119, 124 (2d Cir.1960);
 
 In re Baths International Inc.,
 
 31 B.R. 143, 145 (S.D.N.Y.1983). A debt is not entitled to priority simply because the right to payment arises after the debtor in possession has begun managing the estate.
 
 Jartran, supra,
 
 732 F.2d at 587;
 
 Mammoth Mart, supra,
 
 536 F.2d at 955.
 

 Thus, whether the McFarlin’s "withdrawal liability” is an administrative expense depends upon the consideration supporting the Fund’s right to receive it. The history of the MPPAA demonstrates that the employer’s lump sum payment in satisfaction of his withdrawal liability is made to guarantee pension benefits already earned by those employees covered by the Plan. Were the employer not withdrawing from the plan, he would be obligated to continue making periodic contributions to the Fund after his withdrawal. The consideration supporting the withdrawal liability is, therefore, the same as that supporting the pensions themselves, the past labor of the
 
 *102
 
 employees covered by the Plan. See, e.g., House Report (Education and Labor Committee) No. 93-533, Oct. 2, 1973,
 
 reprinted in
 
 1974 U.S.Code Cong. & Ad.News 4639, 4640 (pension payments deferred compensation for labor).
 

 The MPPAA was enacted as a result of experience following World War II, when steadily increasing numbers of employees successfully bargained with their employers for pension benefits.
 
 Id.
 
 4640-41. Most employers provided the benefits through private plans.
 
 Id.
 
 In 1974 Congress adopted the Employee Retirement Income Security Act (ERISA) to protect employees with pension rights vested in such plans from the “great personal tragedy” of losing those rights when the plans terminated.
 
 Nachman Corp. v. Pension Benefit Guaranty Corp.,
 
 446 U.S. 359, 374, 100 S.Ct. 1723, 1733, 64 L.Ed.2d 354 (1980) (quoting statement of Senator Bentsen, 3 Leg. History of the Employee Retirement Income Security Act of 1974, 94th Cong., 2d Sess. 4793 (Comm.Print 1976)).
 
 See also Textile Workers Pension v. Standard Dye & Finishing,
 
 725 F.2d 843, 847 (2d Cir.1984). ERISA regulated the funding, management, operation and benefit provisions of private pension plans and established a program to insure employee benefits in the event of plan termination. The insurance program was administered by the Pension Benefit Guaranty Corporation (PBGC).
 

 As originally structured ERISA allowed some employers to withdraw from pension plans without requiring them to pay for benefits promised to and earned by their employees. “If an employer wanted to withdraw [from a plan] it could do so without incurring liability, unless the plan terminated within five years of the employer’s withdrawal without assets sufficient to provide employee benefits” at the level guaranteed by the PBGC.
 
 Textile Workers, supra,
 
 725 F.2d at 848. The withdrawal of employers allowed them to leave plans without fully funding the benefits vested in, and therefore earned by, their employees up to the time of the withdrawal. Then, as now, employers contributed to multiemployer plans at rates specified in their collective bargaining agreements with their employees’ unions. The contributions were based “on hours worked by employees, units of production ... or a percentage of compensation.” House Report (Education and Labor Committee) No. 869, Apr. 3, 1980, 96th Cong., 2d Sess.,
 
 reprinted in
 
 1980 U.S.Code Cong. & Ad.News, 2918, 2921. (H.R. No. 869). Plan trustees established plan benefit levels based on their projection of the plan’s expected resources and the cost of benefits. “The resources of a plan available to pay those benefits consist of assets held by the plan. Future contributions expected by the plan and income expected to be earned on plan investments for the future.” Joint Explanation of S.1076: Multiemployer Pension Plan Amendments Act of 1980, 126 Cong.Rec. S.20189, S.20191 (July 29, 1980) (Joint Explanation). Accordingly, the plan, and, indirectly, each participating employer promised to all participating employees (including those employed by others) benefits based on projections of future employer contributions. However, when an employer withdrew from the plan, the plan was “unlikely to have the resources necessary to provide benefits promised to employees,”
 
 id.,
 
 unless a way was found to compensate the plan for the value of the future contributions it would lose because of his withdrawal. Moreover, the amount of the employers’ contributions often did not, in fact, cover the present value of those benefits. “[BJecause benefit promises may be funded over many years after they are made, the withdrawing employer may not have made sufficient contributions to the plan to fund a fair share of the cost of those benefit promises.”
 
 Id.
 
 at S.20192.
 

 Congress concluded that, if an employer were permitted to withdraw from a plan without paying his share of the funds needed to fully fund the vested benefits of the employees covered by the plan, other employers would be encouraged to desert plans. That, in turn, would endanger the plans themselves, placing a heavy burden on the PBGC and threatening those bene
 
 *103
 
 fits which the PBGC did not insure. Absent a withdrawal liability, once an employer withdrew from a plan the contributions required of the remaining employers to fund the plan’s vested benefits would increase. Congress concluded that “the rising costs ... [could] encourage — or force— further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base. This vicious downward spiral ... [could] continue until it ... [was] no longer reasonable or possible for the pension plan to continue.”
 
 Textile Workers, supra,
 
 725 F.2d at 848 (quoting Pension Plan Termination Insurance Issues: Hearing Before the Subcommittee on Oversight of Committee on Ways & Means, House of Representatives, 95th Cong., 2d Sess. 22 (1978)).
 
 See also
 
 H.R. No. 869,
 
 supra,
 
 at 54.
 

 Congress therefore in 1980 adopted the MPPAA. The Act mandates that if “an employer withdraws from a multiemployer plan in a complete or partial withdrawal,” he incurs a “withdrawal liability” to the plan. 29 U.S.C. § 1381(a). This liability is designed to insure that before leaving a plan an employer would pay his “proportionate” share of the plan’s liability for vested but unfunded benefits attributable to work already performed. H.R. 869,
 
 supra,
 
 at 67.
 
 See also Textile Workers, supra,
 
 725 F.2d at 849; Joint Explanation,
 
 supra,
 
 at S.20195. That liability usually accumulates over a period of years prior to the departure of the withdrawing employer.
 

 The manner in which the MPPAA calculates withdrawal liability confirms that the liability represents an employer’s accelerated contribution of funds needed to finance employees’ pension rights which have vested at the time of withdrawal but which have not been fully funded at that date. Each of the MPPAA’s four methods of establishing the amount of “withdrawal liability,” 29 U.S.C. § 1391, accordingly extrapolate the employer’s proportionate share of the plan’s unfunded, vested benefits from such factors as the employer’s past contributions to the plan and the portion of the plan’s unfunded benefit obligations attributable to the employer’s employees. H.R. No. 869,
 
 supra,
 
 at 67, 71, 77-78, 82, House Report (Ways and Means Committee) No. 76-869(11), Apr. 23, 1980, 96th Cong.2d Sess., at 16. Under the “presumptive” method, which the Fund applied in the present case,
 

 “a plan’s unfunded vested benefits accumulated in the years ending before ... [September 25, 1980], are to be allocated to the employers who maintained the plan before that date and continued to maintain the plan after ... [Sept. 25, 1980]. The share of those unfunded vested benefits for which an employer is liable generally depends upon the employer’s proportionate share of total contributions to the plan during the five plan years preceding ... [Sept. 25, 1980]. A change in unfunded vested benefits for a year ending after ... [Sept. 25, 1980] is generally to be allocated to withdrawing employers in proportion to their plan contributions for the five plan years preceding the year of withdrawal.” Joint Explanation,
 
 supra,
 
 at S.20190.
 

 Since withdrawal liability is based on the withdrawing employer’s contributions to the Plan prior to the year before the employer withdraws, 29 U.S.C. § 1391, McFarlin’s withdrawal liability is related to the years 1975-81. The consideration supporting its withdrawal liability was, therefore, the work of employees in the alteration department during those earlier years. Since McFarlin’s did not file for bankruptcy and become a debtor in possession until March 1982, this consideration was not furnished for the benefit of the debtor in possession or for the continuation of McFarlin’s business after it went into bankruptcy. It is attributable to the period pre-dating the filing of the Chapter 11 petition. It cannot, therefore, qualify as an administrative expense within the meaning of §§ 503(b)(1)(A) and 507 of the Bankrupt
 
 *104
 
 cy Code since it was not incurred for the benefit of the estate’s creditors.
 
 [2]
 

 The foregoing view finds support in decisions uniformly rejecting the argument that withdrawal liability is entitled to priority as an administrative expense incurred by the trustee in bankruptcy or debtor in possession in order to operate or preserve the business.
 
 Trustees of Amal. Ins. Fund v. Kessler,
 
 55 B.R. 735 (S.D.N.Y.1985);
 
 In re United Department Stores, Inc.,
 
 49 B.R. 462, 12 Collier, Bankruptcy Cases 1424 (Bankr., S.D.N.Y.1985);
 
 In re Cott Corp.,
 
 47 B.R. 487, Bankr.L.Rep. (CCH) ¶ 70,304 (Bankr., D.Conn.1984);
 
 In re Pulaski Highway Exp., Inc.,
 
 41 B.R. 305, 310-11 (Bankr., N.D.Tenn.1984);
 
 In re Concrete Pipe Machinery Co.,
 
 28 B.R. 837, 8 Collier, Bankruptcy Cases 294, 299 (Bankr., N.D.Iowa 1983);
 
 In re Granada Wines, Inc.,
 
 26 B.R. 131, 134 (Bankr., D.Mass.1983);
 
 In re Goldblatt Bros., Inc.,
 
 No. 81-B-7075 (Bankr., N.D.Ill. Nov. 12, 1982).
 

 Our decision is not inconsistent with cases holding that a bankrupt’s obligation to pay severance pay, which arises out of the termination of an employee during bankruptcy, is an administrative expense entitled to priority.
 
 See, e.g., In re W.T. Grant Co.,
 
 620 F.2d 319, 320-21 (2d Cir.1980), ce
 
 rt. denied,
 
 446 U.S. 983, 100 S.Ct. 2963, 64 L.Ed.2d 839 (1980);
 
 Matter of Unishops, Inc.,
 
 553 F.2d 305, 308 (2d Cir.1977);
 
 Straus-Duparquet, Inc. v. Local U. No. 3 Int. Bro. of Elec. Wkrs.,
 
 386 F.2d 649, 650-51 (2d Cir.1967). These decisions rest on the basis that severance pay is compensation for the hardship which all employees, regardless of their length of service, suffer when they are terminated and that it is therefore “earned” when the employees are dismissed. Accordingly it is granted a first priority as a cost of doing business during the bankruptcy proceeding. An employer’s withdrawal liability payment, on the other hand, is the means by which the employer funds benefits that his employees have “earned” by their past service and that he would normally finance through continuing contributions to his employees’ pension plan. Indeed, it appears to be the general rule that when severance pay, like vacation pay, represents compensation for the employee’s past services it is not an administrative expense entitled to priority.
 
 Matter of Pacific Far East Line, Inc.,
 
 713 F.2d 476, 478 (9th Cir.1983);
 
 In re Health Maintenance Foundation,
 
 680 F.2d 619, 621-22 (9th Cir.1982);
 
 Mammoth Mart, supra,
 
 536 F.2d at 955;
 
 Alpert v. New York, New Haven and Hartford B.R. Co.,
 
 348 F.2d 304, 306 (2d Cir.1965);
 
 In re Public Ledger,
 
 161 F.2d 762, 769-71, 773 (3d Cir.1947). The “severance pay” decisions, therefore, lend no support to the Fund’s contention in the present case.
 

 The Fund next argues that, regardless of the foregoing, at least 50% of an insolvent employer’s withdrawal liability is entitled to priority under § 4225(b) of the MPPAA,
 
 *105
 
 29 U.S.C. § 1405(b). We disagree. Section 1405(b) provides that in the case of withdrawal by an insolvent employer undergoing liquidation or dissolution the employer shall be liable in a sum not in excess of 50% of the unfunded vested benefits allocable to it and, for the second 50%, only to the extent that the value of the estate less the first 50% of withdrawal liability exceeds its liabilities.
 
 [3]
 

 Matter of Cott Corp.,
 
 26 B.R. 332, 335 (Bankr., D.Conn.1982); Soble, “Bankruptcy Claims of Multi-Employer Pension Plans,” 33
 
 Labor Law Journal
 
 57, 60 (1982); Perkins, “Pension Claims In Bankruptcy,” 32
 
 Labor Law Journal
 
 343, 343 (1981).
 

 Neither the language nor the purpose of § 1405(b)(1) suggests that the first 50% of an employer’s withdrawal liability is entitled to priority over other debts. It establishes only the extent or amount by which a fund claiming withdrawal liability against an insolvent employer will receive full creditor treatment. Congress simply recognized that in certain limited circumstances the interests of the withdrawing employer outweighed those of the employees whose benefits were at stake and of other employers in the Plan who would be required partially to fund the shortfall resulting from the withdrawal. In short, § 1405 amounts to a “special relief rule,” Joint Explanation,
 
 supra
 
 at S.20195, enacted to enable economically strapped employers to survive and designed to help pension funds by encouraging creditors to lend to such employers. As a further step toward assisting the funds in such circumstances, 29 U.S.C. § 1402(a), (b), requires the government to establish a program under which Multiemployer Pension and Employee Benefit Plans will be reimbursed for withdrawal liability payments that are uncollectible because the withdrawing employer has undergone Chapter 11 or similar proceedings.
 

 For the foregoing reasons the order of the district court is affirmed.
 

 [1]
 

 . Title 11 U.S.C. §§ 503, 507 are part of the Bankruptcy Code. The Code supplanted the Bankruptcy Act in October 1979. The Act had accorded administrative expenses a priority. Bankruptcy Act § 64a(1); 11 U.S.C. § 104(a)(1). Title 11 U.S.C. § 503(b)(1)(A), which defines administrative expense as including the actual necessary expenses of preserving the estate, is derived from § 64a(1), Senate Report (Judiciary Committee) No. 95-989, July 14, 1978, 66
 
 reprinted in
 
 1978 U.S.Code Cong. & Ad.News 5787, 5852; House Report (Judiciary Committee) No. 95-595, Sept. 8, 1977, 355
 
 reprinted in
 
 1978 U.S.Code Cong. & Ad.News 5787, 6311.
 

 Accordingly, judicial interpretations of the old 11 U.S.C. § 104(a)(1) are relevant to the interpretation of the new 11 U.S.C. § 503(b)(1)(A).
 
 See, e.g., Matter of Jartran, Inc.,
 
 732 F.2d 584 (7th Cir.1984);
 
 In re Baths International, Inc.,
 
 31 B.R. 143, 145 (Bankr., S.D.N.Y.1983). They will be relied on throughout this opinion.
 

 [2]
 

 .
 
 Having concluded that under the terms of the MPPAA withdrawal liability is attributable to a period pre-dating the McFarlin’s Chapter 11 proceeding and cannot therefore be treated as an administrative expense, we need not express any views regarding the Bankruptcy Court’s rationale to the effect that the same result is dictated by 11 U.S.C. § 365(a). Under that provision the debtor-in-possession’s rejection of an executory contract such as a collective bargaining agreement,
 
 N.L.R.B. v. Bildisco and Bildisco,
 
 465 U.S. 513, 104 S.Ct. 1188, 1194-95 & n. 6, 79 L.Ed.2d 482 (1984), is backdated to the date immediately preceding the filing of the Chapter 11 proceeding, in this case to March 16, 1982. Moreover, McFarlin's compliance with the collective bargaining agreement during the period from March 16, 1982, to November 13, 1982, and later inaction until it was rejected in September 1984, did not constitute either an assumption or a rejection of the contract.
 
 See, e.g., Matter of Whitcomb & Keller Mortg. Co., Inc.,
 
 715 F.2d 375, 380 (7th Cir.1983);
 
 In re Kelly Lyn Franchise Co., Inc.,
 
 26 B.R. 441, 444-45 (Bankr., M.D.Tenn.1983);
 
 In re Marple Publishing Co., Inc.,
 
 20 B.R. 933, 935 (Bankr., E.D.Pa.1982);
 
 In re Price Chopper Supermarkets, Inc.,
 
 19 B.R. 462, 467 (Bankr., S.D.Cal.1982); 2 L. King, Collier on Bankruptcy § 365.03[1] at 365-26 (15th ed. 1984) (1985 Supp.).
 

 However, we do note that withdrawal liability does not derive from the collective bargaining agreement but from the MPPAA and that reliance on § 365 of the Bankruptcy Code would appear to conflict with the MPPAlA's provision, 29 U.S.C. § 1383(a), (e), that withdrawal occurs when an employer
 
 “permanently
 
 ceases all covered operations under the plan” (emphasis supplied). In this case that did not occur until November 1982.
 

 [3]
 

 . Section 4225(b) of the MPPAA, 29 U.S.C. § 1405(b) provides in pertinent part:
 

 "In the case of an insolvent employer undergoing liquidation or dissolution, the unfunded vested benefits allocable to that employer shall not exceed an amount equal to the sum of—
 

 (1) 50 per cent of the unfunded vested benefits allocable to the employer (determined without regard to this section), and
 

 (2) that portion of 50 per cent of the unfunded vested benefits allocable to the employer (as determined under paragraph (1) which does not exceed the liquidation or dissolution value of the employer determined—
 

 (a) as of the commencement of liquidation or dissolution, and
 

 (b) after reducing the liquidation or dissolution value of the employer by the amount determined under paragraph (1).”