**In re SUNARHAUSERMAN, INC. and Hauserman, Inc., Debtors.**

**Bankruptcy Nos. 89–04100, 89–04101.**

United States Bankruptcy Court, N.D. Ohio.

June 15, 1995.

Michael D. Zaverton, Dettelbach, Sicherman & Baumgart, Cleveland, OH, for debtors.

David M. Fusco, Schwarzwald & Rock, Cleveland, OH, and Judy I. Padow, Robinson, Silverman, Pearce, Aronsohn & Berman, New York City, for United Furniture Worker's Pension Fund.

## MEMORANDUM OF OPINION

DAVID F. SNOW, Bankruptcy Judge.

Sunarhauserman, Inc. (the "Debtor") was a party to a collective bargaining agreement with the United Furniture Workers of America, Local 450, covering employees in its wall products business when the petition commencing this chapter 11 case was filed. United Furniture Workers Pension Plan A ("Plan A") is the multi-employer pension plan which administer the pension funds contributed by the Debtor under the collective bargaining agreement. In June 1994 Plan A filed a claim to recover the Debtor's liability for withdrawing from Plan A as a first priority administrative expense. Plan A's claim arises under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 et seq., ("ERISA"). The Debtor objected to the claim on the ground that Plan A's claim does not qualify for administrative expense priority. The parties have briefed their positions and entered into stipulations which set forth the relevant facts. They have requested the Court to decide this priority dispute on the basis of their briefs, pleadings, and stipulations.

### Background

The Debtor, together with its parent Hauserman, Inc., filed petitions for reorganization under chapter 11 of the Bankruptcy Code on October 5, 1989. The Debtor sold the operating assets of its wall products business in January 1990 but agreed with the buyer to operate the plant while the buyer did an environmental study of the plant. The Debtor continued to supply wall products to the buyer through November 1991, when the Debtor ceased operations at the plant and terminated most of its remaining employees covered by Plan A. During the postpetition period the Debtor made contributions to Plan A in the amount required under the collective bargaining agreement.

Plan A is a multi-employer plan within the meaning of ERISA section 4001(a)(3), 29 U.S.C. § 1301(a)(3). Debtor's termination of wall product manufacture effected its complete withdrawal from Plan A. By virtue of that withdrawal, the Debtor incurred withdrawal liability under section 4201 of ERISA, 29 U.S.C. § 1381. ERISA imposes on an employer which withdraws from a multi-employer pension plan liability for a share of the plan's unfunded vested benefits determined as of the end of the plan year immediately prior to the plan year of the employer's withdrawal. The amount of a plan's unfunded vested benefits is the excess of the value of the nonforfeitable benefits under the plan over the value of the assets of the plan. ERISA section 4213(c), 29 U.S.C. § 1393(c). Plan A's fiscal year commences March 1 and ends on the last day in February.

ERISA prescribes one basic and three alternative methods to compute withdrawal liability. ERISA section 4211, 29 U.S.C. § 1391. Plan A computed Debtor's withdrawal liability under the presumptive method, the basic method under section 4211. Attached as Exhibit A is the work sheet of Plan A's actuary showing his computation of the Debtor's withdrawal liability.

Plan A's total unfunded vested benefits for the plan year beginning March 1, 1991, were $5,348,870, which is the sum of the next to last column on Exhibit A. The actuary allocated this amount to prior plan years as shown on the next to last column of Exhibit A as prescribed in ERISA section 4211(b), 29 U.S.C. § 1391(b). The Debtor's share of each year's allocation, which is shown in the final column of Exhibit A, bears the same ratio to the total unfunded vested benefits for that year as Debtor's contributions to Plan A during the preceding five years bears to the total contributions made by all employers to the Pension Plan during that five-year period. Debtor's share of Plan A's unfunded vested benefits was $220,785 for the plan year beginning March 1, 1991. Under the ERISA formula this amount fixed the Debtor's liability for withdrawal from Plan A at any time during the ensuing 12 months ending February 29, 1992, without regard to the date of Debtor's withdrawal or the number of employees covered during that period.

Plan A does not claim that the full amount of the Debtor's $220,785 withdrawal liability is an administrative expense. Rather, it computed the administrative expense portion of its claim by attributing to the postpetition

period the full amount of the withdrawal liability of $178,642 allocated under the formula to the Debtor for the plan year beginning March 1, 1990, and ending February 28, 1991, less five-twelfths of the $104,183 surplus allocated to the plan year beginning March 1, 1989, and ending February 28, 1990, for a total of $135,232. The balance of the plan year ended February 28, 1990, from March 1, 1989, to October 5, 1989, when the Debtor's petition was filed, was allocated to the prepetition period. The Debtor asserts that little or none of the Debtor's withdrawal liability computed according to ERISA formulae bears sufficient relation to the Debtor's postpetition activities to qualify as administrative expense under the Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (the "Code").

## Analysis

Section 507(a)(1) of the Code accords administrative expenses first priority. The term "administrative expenses" is not defined in the Code except by illustration in section 503(b)(1) as follows:

> After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case:

In general, to qualify as an administrative expense the claim must not only arise postpetition but must bear an appropriate relation to the postpetition period as well. *Employee Transfer Corp. v. Grigsby (In re White Motor Corp.)*, 831 F.2d 106 (6th Cir.1987).

> The test for whether a claim qualifies for payment as an administrative expense is set forth in *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir.1976). In *Mammoth Mart* the court stated that a claimant must prove that the debt (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate.

831 F.2d at 110.

Plan A seeks to bring itself within the *Mammoth Mart* test by arguing that the Debtor benefited from its participation in Plan A after the petition was filed. It is difficult to discern what that benefit was. Soon after filing its petition, the Debtor embarked on a program to liquidate its businesses and assets. Debtor continued to operate its wall products plant only because the buyer of the wall products business would not take possession of the plant because of environmental concerns. There is no evidence that the postpetition coverage of Debtor's shrinking work force under Plan A was of any material benefit to Debtor.

Plan A also argues that the Debtor chose to retain pension coverage postpetition. Had it done so there is authority that its postpetition choice would confer administrative expense status on the corresponding liability without regard to benefit. *See Alabama Surface Mining Commission v. N.P. Mining Co., Inc. (In re N.P. Mining Co., Inc.)*, 963 F.2d 1449 (11th Cir.1992). The only evidence for such a choice is that the Debtor continued to make its required contributions to Plan A and did not earlier terminate the Plan.

Section 1113 of the Bankruptcy Code erects formidable barriers to the modification or termination of collective bargaining agreements. The Court sees no basis to view the Debtor's action in this case as evidencing a choice on the Debtor's part to assume the collective bargaining agreement or continued coverage by Plan A. Had the Debtor in fact chosen to assume the collective bargaining agreement and its obligations under Plan A, the full amount of the withdrawal liability should be accorded administrative expense status under *White Motor, supra*, not a pro-rated portion as Plan A urges.

In fact, so far as appears, no case has accorded the full amount of withdrawal liability administrative expense status. The courts appear universally to have rejected the position that withdrawal liability is entitled to administrative expense status simply because it arises postpetition. The cases have accepted the principle that withdrawal liability should be correlated with the employment services to which it relates. The

leading case on the issue held that where the withdrawal liability was measured by prepetition employee services it was not entitled to administrative expense priority. *Trustees of Amalgamated Ins. Fund v. McFarlin's Inc.,* 789 F.2d 98 (2nd Cir.1986); *see also In re Pulaski Highway Express, Inc.,* 57 B.R. 502 (Bankr.M.D.Tenn.1986); *In re Cott Corp.,* 47 B.R. 487 (Bankr.D.Conn.1984).

It is clear under the cases that the Court must limit the administrative expense priority component of Plan A's claims to the amount Plan A shows to bear a direct relation to the Debtor's postpetition operations. Administrative expense and other priorities must be strictly construed consistent with the Bankruptcy Code's fundamental objectives. *Woburn Assoc. v. Kahn (In re Hemingway Transport, Inc.),* 954 F.2d 1 (1st Cir.1992); *United Trucking Serv., Inc. v. Trailer Rental Co., Inc. (In re United Trucking Serv., Inc.),* 851 F.2d 159, 162 (6th Cir. 1988); *see also Joint Industry Bd. of Elec. Indus. v. United States,* 391 U.S. 224, 228, 88 S.Ct. 1491, 1493–94, 20 L.Ed.2d 546 (1968); *In re United Merchants & Mfrs., Inc.,* 597 F.2d 348, 349 (2nd Cir.1979); *In re Mammoth Mart, Inc.,* 536 F.2d 950, 953 (1st Cir. 1976). Priorities impair the principle of distributive equality among creditors, *In re McFarlin's, supra,* at 100, and should be kept to a minimum to encourage rehabilitation. *General American Transp. Corp. v. Martin (In re Mid Region Petroleum Inc.),* 1 F.3d 1130, 1134 (10th Cir.1993). The claimant has the burden of proving that its claim is entitled to administrative priority. *In re United Trucking Serv., Inc.,* 851 F.2d at 162; *In re White Motor Corp.,* 831 F.2d at 110; *Woburn Assoc. v. Kahn (In re Hemingway Transport, Inc.),* 954 F.2d 1 (1st Cir.1992). Plan A argues that it has met this burden as to most of the Debtor's withdrawal liability by allocation of that liability to Plan A's plan years as set out in Exhibit A. There are, however, serious problems with its allocation.

Debtor formally withdrew from Plan A on December 1, 1991, nine months after the end of the 1991 plan year which ended on February 28, 1991, when Plan A's unfunded vested

benefits were computed. There is no evidence as to what Plan A's unfunded vested benefits were on December 1, 1991, or at any time after March 1, 1991. This means that there is no real correlation between the duration or extent of the Debtor's operations and the amount of its withdrawal liability that would qualify for administrative expense priority under the ERISA formulae.

For example, the Debtor's share of allocable unfunded benefits became fixed on March 1, 1991, for the full ensuing 12–month period. Therefore, under Plan A's analysis, the Debtor would have been subject to the same administrative expense claim for withdrawal liability had it withdrawn on March 1, 1991, instead of December 1, 1991. Had it withdrawn from Plan A the day before on February 28, 1991, on the other hand, it would have had a withdrawal liability of only $41,143 ($220,785 minus $178,642) under Plan A's allocation, none of which would have qualified for administrative expense priority. This dramatizes the fact that in computing withdrawal liability, ERISA focuses on historical data with little if any regard to events, such as declining employment, during the year when withdrawal in fact occurs. Therefore, these formulae provide no real basis for allocating the Debtor's withdrawal liability to events occurring during the postpetition period. But even if the formulae were accepted as a basic framework for determining the amount of Plan A's administrative expense claim, the components of the withdrawal liability in this case preclude most of it being accorded administrative expense status.

The lion's share of the underfunding allocated by Plan A to its plan year ended February 28, 1991, $3,359,820 of $4,266,241, was caused by a plan amendment adopted by Plan A during that plan year which assured that employees with at least 10 years accredited service would receive not less than $50 monthly. It is not suggested that the Debtor had any say in adopting this plan amendment, that it in any way related to the services Debtor' employees performed postpetition, or that it in any way benefited the Debtor. This amendment created an underfunding liability because it accorded employees benefits based on past services which were not funded when those services were rendered. Clearly under *McFarlin's, supra,* this liability should, for purposes of determining administrative expense, be allocated

to the years when the services were rendered.

The actuary indicates that the next largest portion of the balance of the underfunding for the plan year ended February 28, 1991, was attributable to an unanticipated decrease in contributions during that plan year. Here again, there is no correlation between this shortfall and Debtor's postpetition operations.

■ In summary, the ERISA formulae provide an unsatisfactory basis for allocating withdrawal liability between prepetition and postpetition components. If Plan A's allocation based on the ERISA formula were the best that Plan A could do, the Court would be constrained to find that Plan A had not borne its burden of proving entitlement to administrative expense priority for any part

of its claim. But it is not. At the Court's request the actuary calculated the value of Plan A's pension benefits earned by the Debtor's employees from October 5, 1989, through November 30, 1991 (the actual post-petition period of operations), which, with adjustments for certain withdrawal benefits, totaled $137,505. During that period he calculated that the Debtor had contributed $127,869.04 to the Pension Plan resulting in a shortfall of $9,635.96. This appears to be the best measure of the amount of Debtor's withdrawal obligation that should receive administrative expense treatment. Therefore, the Court finds that $9,635.96 of Plan A's withdrawal liability should be accorded administrative expense status.

The Court's order in conformity with this opinion is attached.

BASIL CASTROVINCI ASSOCIATES INC.

EXHIBIT A

U.F.W. PLAN A WITHDRAWAL LIABILITY
WITHDRAWAL—NOVEMBER, 1991
EMPLOYER—HAUSERMAN CORP.—LOCAL 450

| PLAN YEAR ENDING 2/28 | INDIVIDUAL EMPLOYER CONTRIBUTION | INDIVIDUAL EMPLOYER'S LAST 5 YEARS | TOTAL EMPLOYER'S LAST 5 YEARS | ALLOCABLE UNFUNDED VESTED BENEFITS | EMPLOYER SHARE |
|---|---|---|---|---|---|
| 1976 | $105,000 | | | | |
| 1977 | 140,000 | | | | |
| 1978 | 193,891 | | | | |
| 1979 | 187,582 | | | | |
| 1980 | 211,947 | $ 838,420 | $19,585,052 | $ 4,923,356 | $ 210,760 |
| 1981 | 186,534 | 919,954 | 22,694,925 | 2,524,781 | 102,342 |
| 1982 | 174,473 | 954,427 | 24,352,286 | 1,333,731 | 52,262 |
| 1983 | 177,179 | 937,715 | 24,898,966 | (1,494,406) | (56,286) |
| 1984 | 248,568 | 998,701 | 24,233,653 | 564,708 | 23,268 |
| 1985 | 257,044 | 1,043,798 | 25,110,837 | (2,082,805) | (86,567) |
| 1986 | 226,245 | 1,083,509 | 24,997,341 | (3,861,149) | (167,367) |
| 1987 | 234,070 | 1,143,106 | 24,049,696 | 1,044,796 | 49,658 |
| 1988 | 273,207 | 1,239,134 | 24,422,044 | 1,492,215 | 75,709 |
| 1989 | 244,136 | 1,234,702 | 24,009,286 | (1,117,452) | (57,453) |
| 1990 | 168,087 | 1,145,745 | 24,692,879 | (2,245,146) | (104,183) |
| 1991 | 102,130 | 1,021,630 | 24,398,093 | 4,266,241 | 178,642 |

TOTAL: $220,785

LESS DE MINIMUS: $ 0

TOTAL UVB: 5,348,870   NET LIABILITY: $220,785
DE MINIMUS: 40,117

HIGHEST THREE CONSECUTIVE YEARS OF CONTRIBUTIONS
IN LAST TEN YEARS

1987 234,070
1988 273,207
1989 244,136

751,413 ÷ 3 = 250,471
ANNUAL PREMIUM REQUIRED = 250,471
QUARTERLY PAYMENT REQUIRED BEGINNING APRIL 1, 1993 = 62,617
FINAL PAYMENT TO SATISFY LIABILITY DUE JANUARY 1, 1994 = 32,934

## ORDER

A memorandum of opinion having been issued this day with respect to the claims asserted by United Furniture Workers Pension Plan A ("Plan A") in this case and, for the reasons stated therein,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT Plan A be, and it hereby is, allowed $9,635.96 as an administrative claim pursuant to 11 U.S.C. § 507(a)(1).